# Illinois Official Reports

## Appellate Court

***Young v. Herman*, 2018 IL App (4th) 170001**

| | |
|---|---|
| Appellate Court Caption | CRYSTAL YOUNG and MICHAEL YOUNG, Petitioners-Appellees, v. KOURTNEY HERMAN and DAVID HERRON, Respondents (Kourtney Herman, Respondent-Appellant). |
| District & No. | Fourth District<br>Docket No. 4-17-0001 |
| Rule 23 order filed<br>Motion to publish<br>allowed<br>Opinion filed<br>Rehearing denied | November 6, 2017<br><br>January 3, 2018<br>January 3, 2018<br>January 5, 2018 |
| Decision Under Review | Appeal from the Circuit Court of McLean County, No. 15-F-370; the Hon. William A. Yoder, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Dmitry N. Feofanov, of ChicagoLemonLaw.com, P.C., of Lyndon, and Jeffrey W. Lindsay, of Bloomington, for appellant.<br><br>Gina L. Wood, of Thomson & Weintraub LLC, of Bloomington, for appellees.<br><br>Helen E. Ogar, of Ogar & Miller, of Bloomington, guardian *ad litem*. |

Panel                JUSTICE STEIGMANN delivered the judgment of the court, with opinion.
Presiding Justice Harris and Justice DeArmond concurred in the judgment and opinion.

## OPINION

¶ 1        In December 2015, petitioners, Crystal Young and her husband Michael Young, filed a "petition to establish custody" of Crystal's granddaughter, J.H. (born November 20, 2006), pursuant to section 601 of the Illinois Marriage and Dissolution of Marriage Act (Dissolution Act) (750 ILCS 5/601 (West 2014) (recodified as amended by Pub. Act 99-90 (eff. Jan. 1, 2016) at 750 ILCS 5/601.2)). In their petition, the Youngs alleged that they had cared for and made decisions on behalf of J.H. since she was an infant, in cooperation with J.H.'s mother, respondent Kourtney Herman. Kourtney claimed that the Youngs lacked standing to bring their petition and that it was not in J.H.'s best interests for the Youngs to have custody.

¶ 2        Over a series of hearings in July, August, September, and October 2016, the trial court heard evidence. In October 2016, the court determined that the Youngs had standing and that it was in J.H.'s best interests to award the Youngs primary parental decision-making responsibility for J.H. This appeal followed.

¶ 3                       I. BACKGROUND

¶ 4              A. The Youngs' Petition to Establish Custody

¶ 5        In December 2015, the Youngs filed a petition to establish custody of J.H. pursuant to section 601 of the Dissolution Act (750 ILCS 5/601 (West 2014)). The petition alleged that Crystal was J.H.'s paternal grandmother and that Michael was her husband. The Youngs claimed that J.H. had been in their "physical care, custody, and control" since she was two months old. The Youngs further claimed that J.H.'s mother, Kourtney, had recently removed J.H. from the Youngs' care. The Youngs argued that it was in J.H.'s best interests that the trial court award them custody of J.H. The Youngs requested that the court (1) award the Youngs the "primary care, control and education of [J.H.]" and (2) adjudicate parenting time between the Youngs and Kourtney.

¶ 6        Two days later, the Youngs filed a petition for an emergency order of protection, requesting that J.H. be returned to their care. Shortly thereafter, the trial court entered an emergency order of protection, ordering Kourtney to return J.H. to the physical care of the Youngs. The court later modified the emergency order to allow Kourtney visitation time with J.H. twice a week. (The emergency order of protection was subsequently extended several times by the court.)

¶ 7                  B. Kourtney's Motion to Dismiss

¶ 8        In June 2016, Kourtney filed a combined motion to dismiss the Youngs' petition to establish custody under section 2-619.1 of the Code of Civil Procedure (Code) (735 ILCS 5/2-619.1 (West 2016)).

¶ 9    Kourtney argued that the Youngs' petition should be dismissed under section 2-615 of the Code (*id.* § 2-615) because the petition failed to state a cause of action upon which relief could be granted. Kourtney argued that a nonparent could file a petition for custody only if the child in question was not in the "physical custody" of either of the child's parents. 750 ILCS 5/601(b)(2) (West 2014). Kourtney reasoned that, when the Youngs filed their petition, J.H. was in Kourtney's custody and, therefore, the Youngs' petition failed to state a cause of action.

¶ 10    Kourtney argued further that the Youngs' petition should be dismissed pursuant to section 2-619(a)(9) of the Code (735 ILCS 5/2-619(a)(9) (West 2016)) because the claim was barred by other affirmative matter. Specifically, Kourtney argued that the Youngs lacked standing to bring their claim because J.H. was in the physical custody of Kourtney when the Youngs filed their petition.

¶ 11    The trial court declined to immediately rule on the motion to dismiss and, instead, scheduled a trial, after which the court would decide both the motion to dismiss and best-interests issues.

¶ 12                    C. The Guardian *Ad Litem* Report

¶ 13    In July 2016, the guardian *ad litem*, Helen Ogar, filed a report containing her observations and recommendations concerning J.H. Ogar observed J.H. in Kourtney's home and in the Youngs' home. Ogar stated that both homes showed J.H. a lot of love. When Ogar asked J.H. how much time she spent at each home, J.H. was unable to answer because she did not see a distinction between the two homes. J.H. considered her different family members "one big family." Ogar could not determine whose custody J.H. had been in, as Ogar learned that J.H. spent considerable time with both parties.

¶ 14    Ogar recommended that both Kourtney and the Youngs be involved in J.H.'s life. The Youngs provided a "stability" that J.H. otherwise lacked. Ogar recommended that decision-making should be split evenly between Kourtney and the Youngs, who had been contributing to the decision-making.

¶ 15          D. Evidentiary Hearings in July, August, September, and October 2016

¶ 16    In July, August, September, and October 2016, the trial court conducted six evidentiary hearings to resolve Kourtney's motion to dismiss and the Youngs' petition to establish custody. The following pertinent evidence was presented at those hearings.

¶ 17    Autymne Huerta testified that she lived in the same apartment complex as Kourtney and J.H. from August 2011 through July 2015. During that time, Huerta saw Kourtney bring J.H. to the bus stop every morning. Every time Huerta saw Kourtney, J.H. was with her. However, Huerta also testified that she occasionally saw Crystal dropping off J.H. and picking her up from the school bus.

¶ 18    Derek Riebe testified that he was Kourtney's next-door neighbor from 2010 to 2014. During that time he saw J.H. with Kourtney nearly every day. J.H. and Riebe's daughter played together almost every day after school. Riebe saw Crystal picking J.H. up from school and dropping her off at the bus stop, which he believed she did every day. On most of the occasions when Riebe saw J.H., she was with Kourtney, but the Youngs "were very active grandparents." Riebe believed that Kourtney's mom and sister lived in the apartment with her

and J.H. Riebe assumed he saw Crystal more than Kourtney because Crystal was J.H.'s ride to and from preschool.

¶ 19    Crystal testified that she lived with her husband, Michael, and her granddaughter, J.H., who was the daughter of Crystal's son, David Herron, who was no longer involved in the child's life. In December 2006, David told Crystal that Kourtney had given birth to his child, J.H. That month, Crystal visited Kourtney's home between three and six times. In January 2007, Kourtney agreed to have parentage testing conducted, which showed that David was J.H.'s biological father.

¶ 20    Crystal testified further that beginning in February 2007, Kourtney allowed J.H. to spend the night at Crystal's home anywhere from two to four times per week. Meanwhile, Crystal was supplying J.H. with necessities such as diapers, clothing, and milk. In March or April 2007, after Kourtney had a disagreement with David, she told Crystal that she wanted nothing to do with David and asked Crystal to coparent J.H. with her. From that time until mid-2008, J.H. spent four nights a week at Crystal's home and three nights at Kourtney's. From mid-2008 through October 2015, J.H. spent five or six nights a week at Crystal's home.

¶ 21    Crystal testified further that it was her idea for J.H. to attend preschool, starting when J.H. was 18 months old, which Crystal arranged and paid for. Kourtney accompanied Crystal to appointments with different learning centers during the selection process. Crystal arranged for J.H. to have her first immunizations so that she could start preschool. After preschool started, Crystal took J.H. to and from preschool and bought her supplies. In addition, Crystal located tutoring programs and extracurricular activities for J.H. Crystal scheduled almost all of J.H.'s medical appointments, which both Kourtney and Crystal attended. From 2007 to 2015, Crystal provided Kourtney with transportation because Kourtney's driver's license was revoked, and Crystal also paid some of Kourtney's bills. Crystal also took J.H. on several trips and regularly took her to church. Crystal was concerned because Kourtney smoked cigarettes in her home and sometimes drank alcohol in excess.

¶ 22    Crystal also testified that one afternoon in October 2015, she and Kourtney had a confrontation while waiting for J.H. at the bus stop. Kourtney approached Crystal's car and threatened to physically hurt Crystal because she was "so messy." When the bus dropped off J.H., Kourtney told Crystal that she would never see J.H. again. Kourtney stood nose-to-nose with Crystal and called her profane names. Crystal responded by using a profane insult toward Kourtney. Kourtney took J.H. to Kourtney's home and allowed Crystal only minimal contact with her since.

¶ 23    Henry Guenther testified that he had been the Youngs' next-door neighbor since 2010. Guenther frequently saw J.H. at the Youngs' home. He could see the Youngs' television playing cartoons almost every weekend. In addition, Guenther worked in his yard between three and five times a week and would notice J.H. playing outside.

¶ 24    Michael Young testified that from the time J.H. was a baby, she spent four to five nights per week with the Youngs. Michael was a physician and helped arrange J.H.'s medical care. He and Crystal arranged and paid for J.H.'s day care, preschool, extracurricular activities, and tutoring. Every time Michael visited Kourtney's home, the windows were shut, and the home "reeked" of cigarette smoke. Once in 2011 and once in 2012, Michael received a call from J.H. stating that Kourtney was asleep and would not wake up. When Michael went to Kourtney's home to investigate, he discovered that Kourtney was intoxicated.

¶ 25    Kourtney testified that her driver's license was suspended after a January 2006 conviction for driving under the influence of alcohol. Kourtney testified that at the time of her testimony, her license remained suspended. Kourtney did not work from 2006 through 2013. Since 2013 she has worked as a certified nursing assistant for Aperion Care. Kourtney stated that she planned to move to Florida but that nothing was "set in stone" and she needed to get her driving privileges back and make arrangements in Florida before any move could happen.

¶ 26    Shannon Baxter testified that she was the mother of two of Crystal's other grandchildren. Crystal, Shannon, J.H., and Shannon's son, T.B., once took a trip to Chicago to see a concert. Crystal drove. When Crystal got lost in Chicago, she considered returning to Bloomington and missing the concert. Shannon suggested that T.B. should decide. Crystal responded, "I don't give a fuck about [T.B.] or his birthday." T.B. was "crushed" and began to cry. Crystal then made Shannon and T.B. get out of the car.

¶ 27    In October 2016, after the final evidentiary hearing, the trial court heard arguments from the parties. The Youngs argued that Kourtney had forfeited her standing argument by failing to timely plead it. Alternatively, the Youngs argued that, even if Kourtney properly pled lack of standing, the Youngs had standing to bring their claim because J.H. was not in the "physical custody" of Kourtney or David when the Youngs filed their petition.

¶ 28    The trial court determined that "there was no challenge to standing filed during the time of pleadings." As a result, the court concluded "that issue would be waived." Nonetheless, the court went on to address the merits of the standing issue. The court stated the following about standing:

> "As it relates to the issue of standing as whether or not a parent had, had custody of this child at the time of the pleadings, at the time of the initiation of this proceeding, the, the evidence in this case I think is, is extensive. And the evidence in this case, I believe, demonstrates that [J.H.] was removed from the Youngs' 'custody' a short time prior to the filing of these proceedings. And that I don't believe because [J.H.] was in the physical custody of her biological mother, [Kourtney], at the time of the filling of the proceedings would prohibit the [Youngs] to file this petition, because she was, in essence, yanked from their custody which caused them to initiate these proceedings to seek her return."

The trial court found the testimony of the Youngs, Guenther, and Riebe to be credible.

¶ 29    The trial court also found that Crystal "became the primary caregiver for [J.H.] and that *** Kourtney surrendered that *** duty to Crystal. And that that surrender was an indefinite surrender." The trial court found further that the Youngs provided J.H.'s medical care, oversaw her education, provided for her extracurricular activities, and fostered her spiritual life. In addition, the Youngs provided J.H.'s day-to-day care. The court was not persuaded that Kourtney had "physical custody" of J.H. when the petition for custody was filed.

¶ 30    The trial court concluded that it was in J.H.'s best interests for parental responsibilities to return to the status quo prior to Kourtney's removing J.H. from the Youngs' care. That is, that the Youngs should have primary decision-making responsibility, with parenting time awarded to Kourtney in the amount of every other weekend and one weeknight per week.

¶ 31    In November 2016, Kourtney filed an application for leave to defend as an indigent person and, in December 2016, a petition for attorney fees. At a December 2016 hearing, the trial court denied both of those motions.

¶ 32 Later that month, the trial court entered a written order incorporating its oral rulings from the October 2016 hearing. Specifically, the court determined that it was in J.H.'s best interests to award the Youngs custody of J.H. and to award Kourtney parenting time on Wednesday evenings and every other weekend.

¶ 33 In January 2017, Kourtney filed a notice of appeal.

## II. ANALYSIS

¶ 35 Kourtney argues that the trial court erred by (1) denying her motion to dismiss the Youngs' petition to establish custody and (2) concluding that it was in J.H.'s best interests to award the Youngs primary parenting responsibility. For the following reasons, we disagree with both of Kourtney's arguments and, therefore, affirm the trial court's judgment.

### A. Motion to Dismiss

¶ 37 Kourtney argues the trial court erred by denying her motion to dismiss the Youngs' petition to establish custody. Kourtney makes the following assertions to support that argument: (1) the Youngs lacked standing to file their petition because Kourtney had physical custody of J.H. when the Youngs filed their petition, and (2) the court addressed the issues of standing and best interests in the same hearing, which confused the issues and prejudiced Kourtney.

#### 1. Section 601.2 of the Dissolution Act

¶ 39 On appeal, both parties cite the version of the Dissolution Act that became effective on January 1, 2016. 750 ILCS 5/601.2(b)(3) (West 2016). Although the Youngs filed their petition in December 2015, neither party contends that the prior version of the Dissolution Act should apply, which would be section 601 of the Dissolution Act (750 ILCS 5/601(b)(2) (West 2014)). Because the portions of the Dissolution Act relevant to this appeal are essentially unchanged by the January 1, 2016, amendments, we apply the 2016 version (which is section 601.2 of the Dissolution Act) throughout our discussion, as do the parties in their briefs.

¶ 40 Section 601.2(b)(3) of the Dissolution Act provides that a proceeding for allocation of decision-making responsibilities (formerly known as "custody") of a child may be commenced in the following manner by a person who is not the child's parent:

"by a person other than a parent, by filing a petition for allocation of parental responsibilities in the county in which the child is permanently resident or found, but only if he or she is not in the physical custody of one of his or her parents." 750 ILCS 5/601.2(b)(3) (West 2016).

Thus, the appropriateness of the Youngs' petition for custody turns on whether J.H. was in the "physical custody" of Kourtney when the present action was commenced. See *In re R.L.S.*, 218 Ill. 2d 428, 436, 844 N.E.2d 22, 28 (2006) (interpreting section 601(b)(2) of the Dissolution Act as having the following requirement: "to have standing to proceed on a petition for custody under the [Dissolution] Act, a petitioner must show that the child is not in the physical custody of one of his or her parents").

## 2. "Standing" in This Case

¶ 42    Kourtney argues that the trial court erred by denying her motion to dismiss the Youngs' petition under section 2-619(a)(9) of the Code for lack of standing. Kourtney claims that J.H. was "in the physical custody of one of his or her parents" at the time the Youngs filed their petition. We disagree that section 601.2 of the Dissolution Act, which allows for a nonparent to file a petition for allocation of parental responsibilities (formerly known as a petition for custody) only if the child "is not in the physical custody of one of his or her parents," addresses the standing of the petitioner. See 750 ILCS 5/601.2(b)(3) (West 2016). Instead, we view that requirement as an element of the cause of action that must be pleaded by the petitioner.

¶ 43    Section 601.2 of the Dissolution Act provides that a person who is not a parent or stepparent of a child may commence a proceeding for allocation of parental responsibilities for that child by filing a petition, but only if the child "is not in the physical custody of one of his or her parents." *Id.* That same limitation appeared in the precursor to section 601.2—section 601—which similarly provided that a "child custody proceeding" could be commenced by a nonparent only if the child was not in the physical custody of one of his or her parents. 750 ILCS 5/601(b)(2) (West 2014).

¶ 44    Several Illinois cases have referred to the above-described limitation as an issue of "standing." See, *e.g.*, *In re Petition of Kirchner*, 164 Ill. 2d 468, 491, 649 N.E.2d 324, 334 (1995) (abrogated on other grounds by *R.L.S.*, 218 Ill. 2d 428); *In re Custody of Peterson*, 112 Ill. 2d 48, 53, 491 N.E.2d 1150, 1152 (1986); *In re Parentage of Scarlett Z.-D.*, 2014 IL App (2d) 120266-B, ¶ 19, 11 N.E.3d 360; *In re Custody of Groff*, 332 Ill. App. 3d 1108, 1112, 774 N.E.2d 826, 830 (2002); *In re Custody of K.P.L.*, 304 Ill. App. 3d 481, 486-87, 710 N.E.2d 875, 878-79 (1999); *In re Marriage of Feig*, 296 Ill. App. 3d 405, 408, 694 N.E.2d 654, 656 (1998). However, traditional notions of "standing" do not apply to proceedings under section 601.2 of the Dissolution Act.

¶ 45    In Illinois, the doctrine of standing "assures that issues are raised only by those parties with a real interest in the outcome of the controversy." *Glisson v. City of Marion*, 188 Ill. 2d 211, 221, 720 N.E.2d 1034, 1039 (1999). To have standing, a party must have "some injury in fact to a legally cognizable interest." *Id.* "Lack of standing is an affirmative defense, which the defendant bears the burden to plead and prove." *Id.* at 224. As such, lack of standing is as an affirmative matter properly raised in a section 2-619(a)(9) motion to dismiss. *Id.* at 220.

¶ 46    The language contained in section 601.2(b)(3) of the Dissolution Act, limiting a nonparent's authority to file a petition to allocate parental responsibilities, does not raise traditional notions of standing. Instead, the limitation is a statutory threshold restricting a trial court's authority to address a petition for allocation of parental responsibilities. A petitioner under section 601.2(b)(3) must plead as an element of a petition for allocation of parental responsibilities that this threshold has been crossed, and then the petitioner must prove it at trial.

¶ 47    In support of this conclusion, we note the supreme court's statement in *In re A.W.J.*, 197 Ill. 2d 492, 496, 758 N.E.2d 800, 803 (2001), that "a nonparent's 'standing' under section 601(b)(2) does not refer to whether a litigant has a justiciable interest in a controversy." Instead, "[i]t is merely a threshold issue." *Id.* at 496-97; see also *R.L.S.*, 218 Ill. 2d at 436 ("[W]hen used in this sense, 'standing' simply referred to a threshold statutory requirement that had to be met before the court could proceed to a decision on the merits [citation].").

¶ 48 The same considerations were noted in *In re Custody of McCuan*, 176 Ill. App. 3d 421, 425, 531 N.E.2d 102, 105 (1988). The *McCuan* court noted that the "standing" requirement of section 601(b)(2) of the Dissolution Act "is distinct from the definition [of standing] familiar to most students of the law." *Id.* The court explained that, although this requirement was referred to as one of "standing," the burden to prove it lay with the petitioner: "the nonparent must show that the child is 'not in the physical custody of one of his parents.' " *Id.*; see also *Peterson*, 112 Ill. 2d at 53 ("nonparents must first show that the child is 'not in the physical custody of one of his parents' "); *Groff*, 332 Ill. App. 3d at 1112 ("The nonparent bears the burden of proving that he or she has standing.").

¶ 49 Given that the requirement contained in section 601.2(b)(3) has frequently been mischaracterized as an issue of standing, we understand why the parties and the trial court in this case did the same. However, the limitation contained in section 601.2(b)(3) does not relate to whether the petitioner has an interest in the outcome of the controversy or whether the petitioner has an injury that can be remedied by the court. The limitation is properly understood as an element that must be pleaded and proved by a nonparent petitioner seeking an allocation of parental responsibilities.

¶ 50 Because we conclude that lack of physical custody by the parents is not an issue of standing, we need not address the Youngs' argument that Kourtney failed to timely plead the issue as one of standing under section 2-619(a)(9) of the Code.

¶ 51 3. What Does "Physical Custody" Mean?

¶ 52 Section 601.2 of the Dissolution Act does not define "physical custody." However, extensive case law exists interpreting "physical custody" in the context of section 601 of the Dissolution Act—the precursor to section 601.2 of the Dissolution Act.

¶ 53 Whether a child is in the physical custody of a parent "is not subject to a clear test." *In re Custody of M.C.C.*, 383 Ill. App. 3d 913, 917, 892 N.E.2d 1092, 1096 (2008). Resolving the issue of physical custody "should not turn on who is in physical possession, so to speak, of the child at the moment of filing the petition for custody." *Peterson*, 112 Ill. 2d at 53-54. "Physical possession of a child does not necessarily translate into physical custody ***." *M.C.C.*, 383 Ill. App. 3d at 917. For example, "[n]o one could legitimately suggest that the headmaster of a boarding school or the director of a children's summer camp would have 'custody' under the [Dissolution Act]." *Kirchner*, 164 Ill. 2d at 492 (abrogated on other grounds by *R.L.S.*, 218 Ill. 2d 428).

¶ 54 Some cases have held that to establish physical custody the nonparent must show that the biological parents " 'voluntarily and indefinitely relinquished custody of the child.' " See, *e.g.*, *M.C.C.*, 383 Ill. App. 3d at 917 (quoting *In re Custody of Ayala*, 344 Ill. App. 3d 574, 588, 800 N.E.2d 524, 538 (2003)); *Feig*, 296 Ill. App. 3d at 408; *In re Marriage of Rudsell*, 291 Ill. App. 3d 626, 632, 684 N.E.2d 421, 425 (1997). In addition, when determining whether a parent had physical custody, a court should consider factors including the following: "(1) who was responsible for the care and welfare of the child prior to the initiation of custody proceedings; (2) the manner in which physical possession of a child was acquired; and (3) the nature and duration of the possession." *In re A.W.J.*, 316 Ill. App. 3d 91, 96, 736 N.E.2d 716, 721 (2000).

¶ 55                     4. Did "Physical Custody" Exist in This Case?

¶ 56    Kourtney argues that the Youngs' petition for allocation of parental responsibilities should have been denied because J.H. was in Kourtney's physical custody when the petition was filed. A trial court's finding of physical custody will be affirmed on appeal unless the finding was against the manifest weight of the evidence. *In re Marriage of Ricketts*, 329 Ill. App. 3d 173, 177, 768 N.E.2d 834, 837 (2002). A finding is against the manifest weight of the evidence when the opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence. *Id.* at 181-82. For the following reasons, we conclude that the trial court's finding that J.H. was not in Kourtney's physical custody was not against the manifest weight of the evidence.

¶ 57    Kourtney voluntarily relinquished her parenting responsibilities. Crystal testified that in March or April 2007, Kourtney asked Crystal to coparent J.H. Since that time, the Youngs have steadily taken on additional parenting responsibilities while J.H. has spent more time in their care. Kourtney's allowing the Youngs to "coparent" J.H. constituted a voluntary relinquishment of her parental responsibilities that continued for several years.

¶ 58    Under the three-factor test provided by *A.W.J.*, the trial court's determination that J.H. was not in Kourtney's physical custody was not against the manifest weight of the evidence. The trial court found that the Youngs were responsible for J.H.'s day-to-day care, medical care, education, extracurricular activities, and social life. That factor works in favor of the Youngs' physical custody. As to the second factor—the manner in which physical possession of the child was acquired—Kourtney voluntarily requested that the Youngs help parent J.H. As to the third factor—nature and duration of the possession—the Youngs helped parent J.H. for approximately eight years, a significant period of time.

¶ 59    Kourtney's physical possession of J.H. at the time the Youngs petitioned for custody did not establish that Kourtney had physical custody of J.H. As noted above, mere physical possession of a child at the time a petition is filed is insufficient to establish physical custody. See, *e.g.*, *M.C.C.*, 383 Ill. App. 3d at 917. The approximately two months of nearly exclusive care of J.H. was not enough to overcome the previous eight years during which Kourtney voluntarily relinquished many of her parenting responsibilities to the Youngs.


¶ 60                                 B. Best Interests of J.H.

¶ 61    Kourtney argues that the trial court's allocating primary decision-making responsibilities to the Youngs was not in J.H.'s best interests. We disagree.


¶ 62                     1. Statutory Language and the Standard of Review

¶ 63    The Dissolution Act provides that "[t]he court shall allocate decision-making responsibilities according to the child's best interests." 750 ILCS 5/602.5(a) (West 2016). When determining the child's best interests, the court shall consider all relevant factors, including the following:

> "(1) the wishes of the child ***;
>
> (2) the child's adjustment to his or her home, school, and community;
>
> (3) the mental and physical health of all individuals involved;
>
> (4) the ability of the parents to cooperate to make decisions, or the level of conflict between the parties that may affect their ability to share decision-making;

(5) the level of each parent's participation in past significant decision-making with respect to the child;

(6) any prior agreement or course of conduct between the parents relating to decision-making with respect to the child;

(7) the wishes of the parents;

(8) the child's needs;

(9) the distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and the child's daily schedules, and the ability of the parents to cooperate in the arrangement;

(10) whether a restriction on decision-making is appropriate under Section 603.10;

(11) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child;

(12) the physical violence or threat of physical violence by the child's parent directed against the child;

(13) the occurrence of abuse against the child or other member of the child's household;

(14) whether one of the parents is a sex offender, and if so, the exact nature of the offense and what, if any, treatment in which the parent has successfully participated; and

(15) any other factor that the court expressly finds to be relevant." *Id.* § 602.5(c).

¶ 64    "The trial court is in the best position to judge witness credibility and determine the child's best interests." *In re Marriage of Young*, 2015 IL App (3d) 150553, ¶ 12, 47 N.E.3d 1111. "In child custody cases, there is a strong and compelling presumption in favor of the result reached by the trial court because it is in a superior position to evaluate the evidence and determine the best interests of the child." *In re Marriage of Agers*, 2013 IL App (5th) 120375, ¶ 25, 991 N.E.2d 944. "We will not disturb a trial court's custody determination unless it is against the manifest weight of the evidence." *Young*, 2015 IL App (3d) 150553, ¶ 12. Although the Dissolution Act now refers to "decision-making responsibilities" instead of "custody" (750 ILCS 5/602.5 (West 2016)), we continue to apply the same standard of review, which is the manifest weight of the evidence.

¶ 65                                      2. This Case

¶ 66    Kourtney raises multiple arguments in support of her contention that the trial court's allocation of decision-making responsibilities was against the manifest weight of the evidence.

¶ 67    First, Kourtney argues that the trial court considered evidence prohibited by section 602.5(e) of the Dissolution Act, which provides that "[i]n allocating significant decision-making responsibilities, the court shall not consider conduct of a parent that does not affect that parent's relationship to the child." *Id.* § 602.5(e). Kourtney cites a long list of evidence that she claims was barred by section 602.5(e) and was prejudicial. But Kourtney provides no analysis as to *why* the evidence she cites should have been barred by section 602.5(e).

¶ 68    Next, Kourtney argues that the trial court failed to consider relevant evidence. Kourtney explains that the court "did not reference certain evidence and therefore seemingly did not consider such evidence in its ruling." In particular, Kourtney argues that the trial court failed to consider Crystal's use of profanity toward Kourtney and the violent criminal history of Crystal's sons. Kourtney does not explain how that evidence was relevant to the best-interests analysis. Nor does she point to anything in the record to affirmatively establish that the court failed to consider the evidence in question. A court need not explicitly mention every piece of evidence that it considers in reaching its decision.

¶ 69    Kourtney next contends that the trial court failed to properly weigh the various best-interests factors. We disagree. The court addressed each of the statutory best-interests factors on the record. The court found that J.H. wished for her situation to return to how it had been prior to October 2015. Under that former arrangement, J.H. had adjusted well to home and school life. The court was concerned about Kourtney's health as it related to her consumption of alcohol. The court determined that the Youngs and Kourtney would struggle to return to a cooperative relationship, which supported the court's decision to award the Youngs primary decision-making responsibility instead of an even split of decision-making duties. The court found further that moving to Florida would not be in J.H.'s best interests. In addition, the court found that the Youngs provided J.H. a level of stability that (1) she needed and (2) Kourtney had not provided. Based on the aforementioned evidence, we conclude that the court's decision to award the Youngs primary decision-making responsibility was not against the manifest weight of the evidence.

¶ 70    Finally, Kourtney argues that the trial court evaluation of the witnesses' credibility was flawed. We reject that contention. "We give great deference to the trial court's credibility determinations, and we will not substitute our judgment for that of the trial court." *Vician v. Vician*, 2016 IL App (2d) 160022, ¶ 29, 64 N.E.3d 159.

¶ 71    In sum, the trial court's best-interests determination was not against the manifest weight of the evidence.

¶ 72                                   III. CONCLUSION

¶ 73    We thank the trial court for its careful, extensive evaluation of the evidence in this case, which we found very helpful.

¶ 74    For the reasons stated, we affirm the trial court's judgment.

¶ 75    Affirmed.