NOTICE
Decision filed 07/11/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 230159-U

NO. 5-23-0159

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| SHAWNANDRIANA D., | ) | Appeal from the |
| | ) | Circuit Court of |
| Petitioner-Appellant, | ) | Macon County. |
| | ) | |
| v. | ) | No. 20-D-59 |
| | ) | |
| BRANDON O., | ) | Honorable |
| | ) | James R. Coryell, |
| Respondent-Appellee. | ) | Judge, presiding. |

_____

JUSTICE WELCH delivered the judgment of the court.
Justices Cates and McHaney concurred in the judgment.

**ORDER**

¶ 1  *Held*: The trial court's decisions modifying parental decision-making authority and granting the respondent father's request to relocate with the minor children were not against the manifest weight of the evidence.

¶ 2  This appeal arises out of an order modifying parental decision-making authority and granting a petition for permanent relocation with the parties' minor children filed by the respondent, Brandon O. On appeal, the petitioner, Shawnandriana D., argues, in her *pro se* appellate brief, that the trial court's modification of parental decision-making authority and decision granting Brandon O.'s relocation with the children was against the manifest weight of the evidence.

1

¶ 3                                 I. BACKGROUND

¶ 4       Shawnandriana D. and Brandon O. were married on May 18, 2016, and had two children,

N.O., born August 5, 2016, and J.O., born October 8, 2018.  On February 18, 2020, Shawnandriana

D. filed a *pro se* petition to dissolve the parties' marriage.  On June 16, 2021, the parties entered

into an agreed parenting plan in which Shawnandriana D. would have decision-making authority

with regard to education and health decisions, and the parties would have joint decision-making

authority over extracurricular and recreational activities.    The parties also agreed that

Shawnandriana D. would have the majority of the parenting time, and Brandon O. would have

parenting time during alternating holidays and the children's school breaks.  That same day, the

trial court entered a judgment for dissolution of the marriage, which incorporated the parenting

plan and reserved child support.

¶ 5       On October 29, 2021, Brandon O. filed a *pro se* motion, asserting that Shawnandriana D.

had changed her phone number; he was unable to contact the children on their birthdays; and she

failed to meet him at the drop-off location, so he could exercise his parenting time.  On June 16,

2022, the Illinois Department of Healthcare and Family Services filed a petition to intervene and

a petition to set child support on Shawnandriana D.'s behalf.

¶ 6       On July 12, 2022, Brandon O. filed an emergency petition to modify parental

responsibilities, requesting that Shawnandriana D.'s parenting time be terminated, and he be

awarded the majority of the time.  In the motion, he indicated that, since the entry of the judgment

of dissolution of marriage, Shawnandriana D. entered into a relationship with Anthony S., and she

was pregnant with his baby.  However, there was a history of domestic violence that led to

Shawnandriana D. filing for two orders of protection against Anthony S. (Macon County case Nos.

21-OP-468 and 22-OP-378), both orders of protection were voluntarily dismissed by her and

named N.O. and J.O. as protected persons, and Anthony S. had twice violated the first order of protection (Macon County case Nos. 21-OP-1406 and 21-OP-1551). Brandon O. alleged that Shawnandriana D. had confided to him that Anthony S. was abusive to her and a danger to her and the children. Brandon O. also indicated that Anthony S. was present at a parenting time exchange in early July.

¶ 7    Brandon O. argued that Anthony S. was a threat to the children's mental, physical, and emotional well-being, but Shawnandriana D. was not protecting them from Anthony S. and continued unsupervised contact with him would result in serious endangerment to them. Thus, Brandon O. argued that it was in the children's best interests that he be awarded the majority of the parenting time.

¶ 8    Attached to the emergency motion was Brandon O.'s affidavit, which reiterated the allegations made in the petition. Also, attached were the petitions for orders of protection filed by Shawnandriana D. and police reports documenting Anthony S.'s violations of the orders of protection. In the June 25, 2021, petition for order of protection, Shawnandriana D. asserted that, when she told Anthony S. that she wanted to leave him, he became upset, took her keys and locked her in the house with him, broke her cell phone, tried to choke her and attempted to hit her in the head with a glass plate, threatened that he was going to give her mother a reason to call the police because he was going to send her home with bruises all over her body, and also threatened to kill her while holding a loaded shotgun.

¶ 9    A November 14, 2021, police report indicated that, despite the order of protection, Anthony S. had approached Shawnandriana D. outside her apartment as she was leaving, followed her while she was running errands, tried to get her to pull her vehicle over while she was stopped at a red light, followed her back home, watched her go into the neighbor's apartment, approached that

3

apartment but was told to leave by the neighbor, and then sat in his vehicle in front of the apartments. When the officer spoke with Anthony S., he indicated that he was still living in the apartment with Shawnandriana D., despite the order of protection; they had a disagreement the night before, so he slept in his vehicle; and he was trying to talk to her to apologize. Also, the December 31, 2021, police report stated that Anthony S. was found inside Shawnandriana D.'s apartment with her, and although he knew that there was an active order of protection, Shawnandriana D. had called him and asked him to come over.

¶ 10    In the June 10, 2022, petition for order of protection, Shawnandriana D. indicated that, on June 7, 2022, Anthony S. broke into her apartment, kicked a hole into her bedroom wall, dumped hot sauce on the carpet, and stole her children's birth certificates and other items in the house. She also indicated that he had previously violated an order of protection by stalking her, harassing her, and sending her threatening messages. She asserted that he had been extremely abusive toward her in the past, he had threatened to kill her, and she was scared for her and her children's safety. She was pregnant, and he had threatened to take the baby from her.

¶ 11    On July 12, 2022, the trial court entered an *ex parte* emergency order, terminating Shawnandriana D.'s parenting time with the children pending further court order and granting Brandon O. the majority of the parenting time with the children. The court found that good cause existed that, if Shawnandriana D. had parenting time, that contact may seriously endanger the children's mental, emotional, or physical health.

¶ 12    On August 8, 2022, Brandon O. filed a temporary and permanent petition to modify, requesting that he be awarded the majority of the parenting time and that Shawnandriana D.'s parenting time be terminated. He also filed a petition to relocate with the minor children to St. Louis, Missouri, where he lived.

4

¶ 13    On October 24, 2022, Shawnandriana D. filed a motion for the return of the children to her home. In the motion, she indicated that, on or about June 30, 2022, she and Anthony S. were involved in a domestic abuse incident while the minor children were present, the police were called, and Anthony S. was arrested for domestic battery. She currently had an emergency order of protection against him, which was set for a plenary hearing on October 31. Because of this incident, the Illinois Department of Children and Family Services (DCFS) was called and communicated with Shawnandriana D. regarding the minor children. However, DCFS did not take any action to remove the children from the home, never removed them from her custody, and there was no active DCFS investigation. Thereafter, Brandon O. obtained emergency custody of the children, and Shawnandriana D. had not seen or spoken to them since entry of that order. She requested that the trial court dismiss the *ex parte* order and return the children to her immediately.

¶ 14    On October 31, 2022, Brandon O. filed a response to Shawnandriana D.'s motion, in which he indicated that Shawnandriana D. had already voluntarily dismissed two other orders of protection entered against Anthony S.; that Brandon O. believed that she would dismiss the current order of protection once the children were returned to her; and that Shawnandriana D. had previously told him that, since she was pregnant with Anthony S.'s child, Anthony S. was not "going anywhere." Brandon O. also indicated that the children had witnessed the violence between Shawnandriana D. and Anthony S., and Shawnandriana D. had failed to protect them from these incidents.

¶ 15    On November 17, 2022, an agreed temporary order was entered, in which Brandon O. was temporarily awarded the majority of the parenting time and sole decision-making authority, and Shawnandriana D. was allocated parenting time every other weekend. Shawnandriana D. was prohibited from having Anthony S. around the children.

¶ 16    On February 15, 2023, the trial court held a hearing on the petition to modify and petition to relocate. Shawnandriana D. testified that she was 29 years old; she had two children, ages six and four, with Brandon O.; and they had been residing with Brandon O. since July 12, 2022, when the emergency petition to modify was granted (they had been living with him for approximately nine months). She had an on-again, off-again relationship with Anthony S., who was 56 years old, and she also had a four-month-old child with him. During their relationship, Anthony S. lived with her and the children. Her mother and father lived in the area.

¶ 17    When asked whether there had been violence in the home with Anthony S., Shawnandriana D. responded, "not too much, no." She explained that the relationship was not "too violent" and acknowledged there were a lot of arguments in the past. She also acknowledged that she had sought three orders of protection against Anthony S., and he had "a couple different" felony cases after he violated the orders of protection entered against him. She indicated that she voluntarily dismissed the first order of protection. When asked about her allegations that Anthony S. broke her phone and tried to choke her, she responded, "Well, he didn't choke me, but yes, he did break the phone." Then, when asked about the allegation that he loaded his shotgun in front of her and threatened to kill her with it, she responded, "Well, he persisted, but he didn't go through with it."

¶ 18    Shawnandriana D. further testified that, on November 14, 2021, Anthony S. violated the order of protection when he showed up at her apartment in an attempt to win her back; the children were present during the incident. He then violated the order of protection again after she asked him to come over, and, while there, they got into a fight, and she called the police. Approximately 19 days later, she dismissed the order of protection and was back in a relationship with him where he was around the children.

¶ 19    Shawnandriana D. acknowledged that she filed for a second order of protection on June 10, 2022, because Anthony S. broke into her apartment, kicked a hole in her bedroom wall, stole her children's birth certificates and other items in the apartment, and had threatened to kill her. She also acknowledged that, in the petition, she indicated that he had no motive to be a good person, he was a danger to those around him, he was physically abusive to her in the past, and she was scared for the safety of her children. She further acknowledged that the children were present during some of the past incidents with him. However, on June 29, 2022, the order of protection was dismissed after she failed to appear in court.

¶ 20    Shawnandriana D. acknowledged that she had a parenting time exchange with Brandon O. in July 2022, and Anthony S. was present during the exchange, which was shortly after she dropped the second order of protection. She denied telling Brandon O. about the problems that she was having with Anthony S., denied telling him that she would not have Anthony S. around the children, and denied telling him that Anthony S. was not going anywhere because they had a child together.

¶ 21    Shawnandriana D. was granted another order of protection against Anthony S. on August 23, 2022, approximately two months after Brandon O. was awarded temporary custody of the children. She denied telling Anthony S. to attend the court hearing so that she could obtain the order of protection against him, which would help her in the custody case. Although she acknowledged that she could dismiss the order of protection at any time, she indicated that she had no plans to dismiss it. She had not seen Anthony S. since the entry of this order of protection, he had not seen his child, he had not contacted her about their child, and she did not know where he was living. She testified that Brandon O. knew that she was in a relationship with Anthony S. the entire year they were together. She also testified that Brandon O. received notice from DCFS that

7

there were incidents occurring between her and Anthony S., but Brandon O. did not seek to remove the children from her home until after she filed a petition for child support. Shawnandriana D. testified that the windows and door locks in her apartment were updated after Anthony S. broke into the apartment.

¶ 22 Before the entry of the current parenting plan, Shawnandriana D. had the children the majority of the time since the divorce. J.O. had behavioral issues at daycare; he was disruptive, and he was put in a program to assist with his behavioral issues. She took him to the doctor, and he was ultimately diagnosed with attention deficit hyperactivity disorder and was prescribed medication. Shawnandriana D. gave him the medication as prescribed. N.O. was enrolled in elementary school; her teachers said she was a good child, she was helpful with the other students, and she wanted to learn. Brandon O. had parenting time for three weeks during the summer break, three weeks on winter break, and every other holiday. At the time of the divorce, Shawnandriana D. did not request any child support from Brandon O. because he was supposed to help her with the children. Before the emergency order was entered, she requested his help on numerous occasions, and he never helped her. She denied blocking Brandon O.'s phone after their separation. Although DCFS became involved in March 2022, the children were never removed from her care.

¶ 23 While the emergency order of protection was in place, Shawnandriana D. had FaceTime visits with the children but was unable to see them in person. During those visits, she noticed that the majority of the time the children were being cared for by Brandon O.'s mother.

¶ 24 Brandon O. testified that he lived in St. Louis, Missouri, in a six-bedroom house, and he worked for Uber and Lyft and also did home healthcare. He lived with his mother, his stepfather, brother, sister, and his sister's husband, and his family provided emotional and moral support to

8

the children. The children had their own bedrooms in the house. When he and Shawnandriana D. separated, he did not know where she lived. He believed that she lived with her father, but when he went there, no one would answer the door. He made multiple attempts to contact the children, but she blocked his communications. Once the initial parenting plan was issued following the divorce, he exercised his allocated parenting time with the children and maintained a relationship with them.

¶ 25    Around April or May 2022, DCFS contacted Brandon O. and informed him about the issues between Shawnandriana D. and Anthony S. He then talked to Shawnandriana D.; she told him that she had another altercation with Anthony S., that Anthony S. had threatened her, that Anthony S. was abusing the children, and that Brandon O. needed to get them. Although she claimed that she would not have Anthony S. around the children anymore, he was present during one of the July parenting time exchanges. When Brandon O. asked her about the incident, she said that it did not have anything to do with the children, and Anthony S. was not going anywhere because she was pregnant with his child. After this conversation, Brandon O. filed the emergency petition to have the children removed from her home.

¶ 26    Brandon O. testified that the children moved in with him in July 2022. N.O. was enrolled in school and was loving it. Before the move, she was not mentally present and had a lack of energy. However, currently, she was happy, she was more alive and involved, and she felt safe. Brandon O. indicated that he had a good relationship with her, he provided her with a stable environment, and she was very affectionate with him. J.O. initially had behavioral issues; he used profanity, talked about killing Anthony S., and talked about death and hell. J.O. was now in counseling, and Brandon O. had observed an improvement in his behavior. Brandon O. was currently trying to find J.O. a special education daycare program because he was kicked out of his

9

previous daycare for his behavioral issues. Although J.O. was prescribed medication, Brandon O. had not been giving him the medicine. However, Brandon O. claimed that the medication was only supposed to be taken as needed.

¶ 27 Brandon O. testified that Shawnandriana D. had been consistently late for parenting time exchanges, and she did not exercise her parenting time the weekend of February 10 because she was tired. She had the children for Christmas 2022, but she contacted Brandon O. about four hours into her visit because J.O. was having behavioral issues, and she could not control him. She claimed that J.O. was out of control, was using profanity, spit on his grandmother, punched the glasses off her face, and tried to kick the baby. She wanted Brandon O. to talk to J.O. and get him to behave, and she indicated that she believed J.O. was a danger to the baby. He believed that it was in the children's best interests that they live with him, and Shawnandriana D. be allowed parenting time. Brandon O. testified that there were more school opportunities for J.O. in the St. Louis area compared to Macon County. There were also more things to do with the children in the St. Louis area, such as the zoo, the Children's Museum, and the Magic House.

¶ 28 Patrice H., Shawnandriana D.'s mother, testified that she lived with Shawnandriana D. after the separation from Brandon O. to help with the children.

¶ 29 After Shawnandriana D. and Brandon O. separated, she hardly saw Brandon O. because he had moved back to St. Louis.

¶ 30 On February 24, 2023, the trial court entered an order, granting Brandon O.'s petition to relocate because of the past pattern of domestic violence in Shawnandriana D.'s home. In the order, the court indicated that Brandon O. sought removal due to the continuing domestic violence in Shawnandriana D.'s home, although she claimed that she had resolved the problem. The court indicated that there was evidence presented that the oldest child was enrolled in a St. Louis school

and was doing well and that the younger child had a behavioral disorder that was being treated in Decatur, Illinois, but Brandon O. had sought treatment for the problem in St. Louis. The court further indicated that both parents had a relationship with the children, both had a family support system, there was no evidence that the relocation would have much impact on the children due to their young age, the temporary order as to the allocations of parental responsibilities and parenting time was working, and evidence of the children's preferences was not offered due to their ages. Thus, the court granted Brandon O.'s petition to relocate to St. Louis and ordered the parties to submit proposed parenting plans. Shawnandriana D. appeals.

¶ 31                                II. ANALYSIS

¶ 32        A. Allocation of Parental Decision-Making Authority and Parenting Time

¶ 33    Section 610.5(c) of the Illinois Marriage and Dissolution of Marriage Act (Act) sets forth the requirements for modification of orders allocating parental decision-making responsibilities and parenting time. 750 ILCS 5/610.5(c) (West 2022). Specifically, section 610.5(c) provides that

> "the court shall modify a parenting plan or allocation judgment when necessary to serve the child's best interests if the court finds, by a preponderance of the evidence, that on the basis of facts that have arisen since the entry of the existing parenting plan or allocation judgment or were not anticipated therein, a substantial change has occurred in the circumstances of the child or of either parent and that a modification is necessary to serve the child's best interests." *Id.*

Accordingly, the court may modify parenting time or the allocation of parental responsibilities if a substantial change has occurred in the circumstances of the children or either parent since the existing allocation judgment was entered and such a modification is necessary to serve the children's best interests. *In re Marriage of Virgin*, 2021 IL App (3d) 190650, ¶ 43.

¶ 34    Once a substantial change in circumstances has been found, the trial court must determine whether modification is necessary to serve the children's best interests. 750 ILCS 5/610.5(c)

11

(West 2022). In determining the children's best interests for modifying parenting time, the courts consider the following best-interest factors set forth in section 602.7(b) of the Act: (1) the parents' wishes; (2) the children's wishes; (3) the amount of time each parent spent performing caretaking functions with respect to the children in the 24 months preceding the filing of the petition; (4) any prior agreement or course of conduct between the parents; (5) the interaction and interrelationship of the children with their parents and siblings or any other significant person; (6) the children's adjustment to home, school, and community; (7) the mental and physical health of all involved; (8) the children's needs; (9) the distance between the parents' residences; (10) whether a restriction on parenting time is appropriate; (11) physical violence or threat of physical violence; (12) the willingness and ability of each parent to place the needs of the children ahead of his or her own needs; (13) the willingness of each parent to facilitate and encourage a close and continuing relationship between the other parent and the children; (14) the occurrence of abuse against the children or other members of the household; (15) whether one of the parents is a convicted sex offender; (16) the terms of a parent's military family-care plan; and (17) any other factor that the court expressly finds to be relevant. *Id*. § 602.7(b); *In re Marriage of Adams*, 2017 IL App (3d) 170472, ¶ 20.

¶ 35 To determine the children's best interests for the modification of the allocation of parental decision-making authority, the trial court must consider all relevant best-interest factors, including: (1) the children's wishes; (2) the children's adjustment to home, school, and community; (3) the mental and physical health of all individuals involved; (4) the parents' ability to cooperate to make decisions; (5) the level of each parent's participation in past significant decision-making about the children; (6) any prior agreement or course of conduct between the parents regarding decision making; (7) the parents' wishes; (8) the children's needs; (9) the distance between the parents'

12

residences; (10) whether a restriction on decision making is appropriate; (11) the willingness and ability of each parent to facilitate and encourage a relationship between the minor children and the other parent; (12) the physical violence or threat of physical violence directed against the children; (13) the occurrence of abuse against the children or other member of the children's household; (14) whether one parent is a sex offender or resides with a sex offender; and (15) any other factor that the court expressly finds to be relevant. *Id.* § 602.5(c).

¶ 36   The trial court's decision regarding whether to modify the allocation of parental decision-making authority and parenting time is subject to a manifest weight of the evidence standard of review. *In re Marriage of Bates*, 212 Ill. 2d 489, 515 (2004); *Young v. Herman*, 2018 IL App (4th) 170001, ¶ 56. This decision is afforded great deference because the trial court is in a superior position to judge the credibility of the witnesses and determine the children's best interests. *Bates*, 212 Ill. 2d at 516. A judgment is against the manifest weight of the evidence when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence. *In re Keyon R.*, 2017 IL App (2d) 160657, ¶ 16.

¶ 37   In this case, since the entry of the judgment for dissolution of marriage, Shawnandriana D. had been involved in an on-again, off-again relationship with Anthony S., a man who had been physically abusive to her in her own home while the children were there. Some of these incidents required police intervention, and DCFS became involved. Shawnandriana D. filed for orders of protection on three different occasions after these incidents of violence. However, the first order of protection was vacated on her own motion, and the second order was dismissed after she failed to appear at the hearing. She then obtained a third emergency order of protection, and a two-year plenary order was entered on November 7, 2022. Although she claims that she has no intention of dismissing the plenary order of protection and has no idea where Anthony S. is residing, she has a

13

child with Anthony S., and her previous history with him indicates an inability to make decisions that are in her children's best interests. Thus, there was a substantial change of circumstances that necessitated a modification of parental responsibilities to serve the children's best interests.

¶ 38    As for the best-interests factors, the children have a relationship with both parents. After the judgment for dissolution of marriage was entered, Shawnandriana D. was awarded the majority of the parenting time with the children while Brandon O. had parenting time during their school breaks. Their youngest child, J.O., had behavioral issues that were being treated while in Shawnandriana D.'s care. Shawnandriana D.'s parents lived in the area, and her mother lived with Shawnandriana D. after her separation from Brandon O. to help with the children.

¶ 39    Brandon O. testified that, when Shawnandriana D. had the majority of the parenting time, he exercised his allocated parenting time with them. After the trial court temporarily modified the allocation of parenting time, the children lived with him the majority of the time. He lived in St. Louis in a six-bedroom house with his mother, stepfather, brother, sister, and sister's husband. The children had their own bedrooms in the house, and his family provided both emotional and moral support to them. N.O. was happy in school and felt safe in her environment. Brandon O. had a good relationship with her and provided her with a stable environment. Although J.O. initially had behavioral issues, Brandon O. was addressing those issues by taking him to counseling and trying to find a special education program for him. Since then, Brandon O. had observed an improvement in J.O.'s behavior. Brandon O. acknowledged that he had not been providing J.O. with his prescribed medication but claimed that the medication was only supposed to be taken as needed.

¶ 40    Brandon O. claimed that he did not find out about the domestic violence incidents between Shawnandriana D. and Anthony S. until DCFS contacted him about it in April or May 2022. He

14

then filed the emergency petition to have the children removed from her home after he spoke to her and realized that she was not going to cut off contact with Anthony S. Brandon O. believed that there were more school opportunities and things to do with the children in the St. Louis area.

¶ 41 Based on the above, and after carefully considering the relevant best-interests factors, we conclude that the trial court's decision to modify the allocation of parental responsibilities was not against the manifest weight of the evidence.

¶ 42                                     B. Relocation Decision

¶ 43 Section 609.2 of the Act governs the relocation of the minor children from Illinois. 750 ILCS 5/609.2 (West 2022). A parent who has been allocated the majority of the parenting time may seek to relocate with the minor children. *Id*. § 609.2(b). If the nonrelocating parent objects to the proposed relocation, then the other parent must file a petition seeking court permission to relocate. *Id*. § 609.2(f). The paramount question in relocation cases is whether the move is in the children's best interests. *In re Marriage of Eckert*, 119 Ill. 2d 316, 325 (1988). Thus, the party seeking relocation must establish by a preponderance of the evidence that the relocation is in the children's best interests. *In re Marriage of Kavchak*, 2018 IL App (2d) 170853, ¶ 65. This determination is made on a case-by-case-basis, which depends on the circumstances of each case. *Id*. A trial court's determination of what is in the children's best interests should not be reversed unless it is against the manifest weight of the evidence. *Id*. A court's decision is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent or where its findings are unreasonable, arbitrary, or not based on the evidence presented. *Id*.

¶ 44 When determining whether relocation is in the minor children's best interests, the trial court is required to consider the following 11 factors: (1) the circumstances and reasons for the intended relocation; (2) the reasons, if any, why a parent is objecting to the intended relocation;

15

(3) the history and quality of each parent's relationship with the children and specifically whether a parent has substantially failed or refused to exercise the parental responsibilities allocated to him or her under the parenting plan or allocation judgment; (4) the educational opportunities for the children at the existing location and at the proposed new location; (5) the presence or absence of extended family at the existing location and at the proposed new location; (6) the anticipated impact of the relocation on the minor children; (7) whether the court will be able to fashion a reasonable allocation of parental responsibilities between all parents if the relocation occurs; (8) the wishes of the children, taking into account their maturity and ability to express reasoned and independent preferences as to relocation; (9) possible arrangements for the exercise of parental responsibilities appropriate to the parents' resources and circumstances and the developmental level of the children; (10) minimization of the impairment to a parent-child relationship caused by a parent's relocation; and (11) any other relevant factors bearing on the children's best interests. 750 ILCS 5/609.2(g) (West 2022).

¶ 45    In this case, the trial court granted Brandon O.'s petition to relocate the minor children to St. Louis, Missouri, where he lived with his family. In making this decision, the court considered the past domestic violence in Shawnandriana D.'s home, that each parent has a relationship with the children and have a family support system, the children were doing well living in St. Louis, there was no evidence presented that the relocation would have much impact on the children due to their young age, and the temporary allocation of parental responsibilities and parenting time appeared to be working. The court also noted that the children's preference as to relocation was not considered due to their young age.

¶ 46    On review, this court will not reweigh the evidence. We have thoroughly reviewed the record on appeal and conclude that it does not demonstrate that the trial court's decision as to

16

relocation was against the manifest weight of the evidence. Thus, we affirm the court's decision to grant Brandon O.'s petition to relocate with the minor children to St. Louis, Missouri.

¶ 47    Moreover, with regard to Shawnandriana D.'s *pro se* argument that the trial court erred by not allowing important witnesses to testify at the hearing, we note that there is no indication in the record on appeal that she was prevented from calling certain witnesses. Although she argues that the court refused to allow DCFS to testify, there was no indication that she even made the request to call a DCFS caseworker as a witness, let alone that her request was denied. Her only witness at trial, besides herself, was her mother. Thus, we find that this argument has no merit.

¶ 48                                          III. CONCLUSION

¶ 49    For the foregoing reasons, the judgment of the circuit court of Macon County is hereby affirmed.


¶ 50    Affirmed.