NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 190564-U

NO. 4-19-0564

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 11, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| SUSAN RAY, | ) | Circuit Court of |
|     Petitioner-Appellee, | ) | Champaign County |
|     and | ) | |
| WILLIAM GREGORY RAY, | ) | No. 09D239 |
|     Respondent-Appellant. | ) | |
| | ) | Honorable |
| | ) | Randall B. Rosenbaum, |
| | ) | Judge Presiding. |

JUSTICE KNECHT delivered the judgment of the court.
Justices DeArmond and Harris concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The trial court's denial of respondent's motion to modify the award of parenting time and parental responsibilities is not against the manifest weight of the evidence.

¶ 2     Petitioner, Susan Ray (Susie), and respondent, William Gregory Ray (Greg), are the parents of K.R. (born September 1, 2006) and W.R. (born April 29, 2008). The parties divorced in February 2011. Pursuant to a joint parenting agreement, the parties shared custody of their children. In 2014, Susie became the primary decision-making parent and the parenting time schedule was modified. In November 2018, Greg filed a motion to modify allocation of parenting time and decision making, seeking to become the decision maker for K.R.'s education and extracurricular activities, to modify parenting time to allow K.R. to attend school while

residing with Greg, and to modify the parenting time of W.R., so that the children could be together while residing in different school districts. The trial court denied defendant's request for modification.

¶ 3        Greg appeals, arguing (1) the trial court's order is against the manifest weight of the evidence, (2) the court failed to consider the quality of the school K.R. would attend if she lived with Greg, (3) the court failed to give sufficient weight to the recommendation of the limited guardian *ad litem* (LGAL), and (4) the court failed to give proper weight to K.R.'s desires to reside with Greg. We affirm.

¶ 4                                   I. BACKGROUND

¶ 5        Susie and Greg married in September 2006; Susie filed a petition for dissolution of marriage in May 2009. In October 2010, the court awarded joint custody to the parties, pursuant to the joint parenting agreement. Neither parent was designated the primary residential custodian. The parties were divorced in February 2011. In December 2012, Susie filed a petition to modify child custody. K.R. had started school in Champaign, Illinois, and Greg resided in Rossville, Illinois. Susie alleged the parties were unable to maintain an amicable relationship necessary for successful joint parenting. In October 2014, the parties entered an agreed order, modifying custody and visitation. Under the agreement, Susie was awarded sole custody of K.R. and W.R. Greg had visitation with the children the second and fourth weekend of every month, as well as any fifth weekend on the calendar. The parties agreed to alternate holidays and school breaks. Greg had the children seven weeks each summer.

¶ 6        In November 2016, Greg filed a motion to modify the allocation of parenting time and decision making, the denial of which is the subject of this appeal. Greg alleged a substantial

change of circumstances had occurred since the last custody order was entered. Specifically, Greg alleged K.R. did poorly in school, K.R. complained she did not like school, K.R. was bullied, and K.R. had no time to complete her homework as she was too busy taking care of her younger sister and half-sister. Greg further alleged Susie failed to assist K.R. with her homework and failed to show a sufficient interest in helping rectify the situation. Greg asserted K.R. asked to go to school where her father and two of her half-siblings resided. Greg asserted he was able to provide the educational and emotional needs for K.R.

¶ 7        A hearing was held over two days in August 2019. Evidence concluded at 5 p.m. on August 14, 2019, and school was set to begin for K.R. at 8 a.m. on August 15. The LGAL filed a report; eight witnesses testified.

¶ 8                        A. Report of the Limited Guardian *ad Litem*

¶ 9        The trial court appointed Robert E. Jacobson as the LGAL in the case. The LGAL report was entered into evidence and considered by the court. According to the report, the LGAL performed in-person interviews of Greg, Susie, K.R., and W.R. The LGAL conducted telephone interviews of 11 individuals, including K.R.'s paternal grandparents who testified in the matter. The LGAL also reviewed the psychological evaluations of the parents.

¶ 10                        1. *Interview of Susie*

¶ 11        The LGAL reported Susie had lived in Champaign since fifth grade; her parents still resided there. Susie and Greg's daughter W.R. suffered a chromosome deletion disorder, resulting in significant developmental delays. Susie had another child in October 2010. The father of this daughter was not involved in the child's life, although he paid child support. Susie was a massage therapist who owned her own business, Agape Hearts and Hands Alternative

Therapies. She was also working on classes to become a life coach.

¶ 12　　　　Susie acknowledged K.R. expressed a desire to live with her dad. She believed Greg influenced K.R., causing her to want to live with him. Susie believed K.R. had too much freedom while at Greg's house. Susie also acknowledged K.R. had issues at school. Susie believed she worked with K.R. and the school administrators to address the issues as they arose. K.R. had gotten into trouble for stealing student-incentive cards, but Susie believed K.R. was influenced by a friend to do this. The situation had been resolved. Susie reported Greg committed domestic violence against her during the marriage. Susie showed no concern Greg would be violent toward the children.

¶ 13　　　　　　　　　　　　　2. *Interview of Greg*

¶ 14　　　　The LGAL met with Greg. Greg's parents are Bob and Mary Jo Ray. Greg is the oldest of two siblings, having one younger brother. Greg graduated from Rossville High School in 1996 and attended some college. Greg worked as a farmer with his parents in Rossville. Greg had two children from his marriage with his ex-wife Tara Ray. At the time of the report, A.R. was seven years old and E.R. was four years old. Greg and Tara divorced in 2016.

¶ 15　　　　At the time of the interview, Greg indicated he agonized over whether to seek primary parenting time and decision making for W.R. He informed the LGAL he would like to have W.R. live with him, but he decided the Champaign schools were meeting W.R.'s needs. W.R. was in the fifth grade, but she was performing at a first-grade level.

¶ 16　　　　Greg sought the motion to modify because K.R. had been adamant about wanting to live with him for years. He believed Jefferson Middle School was too large and the students were unruly, creating a difficult learning environment. Greg believed the smaller schools would

allow K.R. to focus on her academics and help her avoid bullying and other issues that occurred in Champaign.

¶ 17　　　　Greg reported concerns about Susie's unwillingness to cooperate over parenting. Susie told the girls Greg would not be at the Special Olympics, in which W.R. was participating, because he was sick. Greg denied he was informed of the event. Regarding Susie's allegations of domestic violence, Greg admitted having "a hair-triggered temper" but stated "Susie tells people many things that are not true."

¶ 18　　　　Greg had "three DUIs—in 2001, 2004, and 2010," and he had a restricted driving permit since 2016. Greg asserted alcohol was not an issue in this case.

¶ 19　　　　　　　　　　　　3. *Interview of K.R.*

¶ 20　　　　The LGAL found K.R. to be friendly and talkative. She was "very clear" about wanting to live primarily with Greg and attend school in Rossville. K.R. reported having a difficult time with her mother. She did not like Jefferson Middle School. To the LGAL, "[i]t appeared *** that [K.R.'s] descriptions of middle school, as well as the reasons she stated for wanting to go to school in Rossville—while likely being her own feelings—were also clearly encouraged and discussed at length at her dad's house." As an example, K.R. was ready with a number of complaints about Susie. These included K.R.'s complaint Susie borrowed $160 from K.R. to pay a past-due utility bill and Susie had not yet repaid the full amount of the loan. K.R. complained her mother routinely found different tutors, but K.R. did not like them. K.R. said her maternal grandmother typically helped with homework and her mom spent most of her time on the computer. K.R. complained her mother yelled at her and called her the " 'B' word." K.R., whenever she cursed back, got into trouble.

- 5 -

¶ 21    K.R. was unhappy her mother took her phone away because she was failing a course at school. Once her phone was taken from her, the ability to communicate with her father was limited. The day after Thanksgiving, Greg allowed K.R. to use her money to purchase a phone. Greg told her not to tell her mother she had the phone. K.R. stated she talked to Greg about Susie. When the LGAL asked K.R. how her dad would respond, she believed he would tell her that he knows Susie is crazy and he cannot believe the things she does.

¶ 22    At the second meeting with K.R., the one where K.R. was brought to the office by Susie, K.R. "seemed to go out of her way to say nicer things about her mom." K.R. was still clear in that she wanted to live with her dad. When asked if K.R. would miss W.R. if she lived with her dad, K.R. said she would but she believed it best for W.R. to continue with her existing routine.

¶ 23    4. *Telephone Interviews*

¶ 24    The LGAL spoke with Tara, Greg's ex-wife. Tara and Greg got along well since the divorce. Tara agreed for Greg to be the primary parent of their children because she believed he had better family support and the children were better off in the Rossville school district. Tara reported Susie was "very difficult to deal with." Tara believed Susie put a lot of stress on K.R. When asked about Susie's domestic-violence allegations, Tara responded, "I am not going to lie to you[;] Greg's got a temper." Tara reported one incident of physical abuse by Greg, which led to their divorce. Despite that incident, Tara believed Greg was a great father.

¶ 25    The LGAL spoke with Cathy Crowder, Susie's mother. Cathy saw Susie and the children almost every day. She was providing transportation for Susie and the children because Susie's car was having transmission issues. Cathy reported, during the marriage, Greg

consistently yelled at Susie and called her names in front of their children. He had also yelled at Cathy during parenting exchanges. Cathy believed Susie was very accommodating when Greg requested changes to the parenting schedule, but he did not reciprocate. Cathy believed part of the reason K.R. was struggling at school was that she was not trying hard enough. Cathy believed K.R. might be doing poorly in school as a means of getting her way in living primarily with Greg.

¶ 26                                 5. *LGAL's Conclusions*

¶ 27          In summarizing his interview of K.R., the LGAL found both parents more than willing to undermine the other. The LGAL noted this was a longstanding issue in the case. The LGAL opined K.R. should reside primarily with Greg and that Greg should be allocated the decision making as to K.R.'s education. The LGAL concluded the decision making in the area of extracurricular activities should be allocated jointly. The LGAL completed his report by making the following statement:

> "This LGAL was troubled by many aspects of this case. As previously mentioned, there is a fairly low level of self-awareness on the part of both parties. They each have very different parenting styles. Ideally, they should appreciate each other's different parenting styles and use these differences to the benefit of their children. However, Greg and Susie have shown—over the course of many years—that they are both unwilling to do so. There are continued concerns regarding the overall lack of communication between the parties as well as hostility between the parties when

communication does take place. Although this LGAL is recommending (with some reservations) that [K.R.] primarily live with Greg during the school year, there are significant concerns regarding Greg's apparent willingness to undermine Susie directly to [K.R.].

Ultimately, this LGAL's recommendation is a recognition that Greg has an extended family that provides a more stable support system, as well as a recognition of [K.R.'s] stated desire to live primarily with her dad and to change schools. Hopefully, a fresh start at a different school will be a positive change for [K.R.], although whether or not she takes advantage of a fresh start is very much up to her. Despite this LGAL's stated concerns and criticisms of both Greg and Susie, they are both likable in many ways and certainly have the ability to be effective parents. Hopefully, they will both take the necessary steps to allow them to get beyond some of their longstanding issues, with a realization that doing so will be very much to their daughters' benefit."

¶ 28                              B. Testimony by the Parties

¶ 29                              1. *William Robert Ray*

¶ 30        William Robert Ray (Bob), K.R.'s paternal grandfather, testified on Greg's behalf. Bob was a farmer; Greg worked for him. Bob was in his seventeenth year as a school board member with Rossville-Alvin schools. In the school district, there were approximately 425

students. In the kindergarten through eighth grade schools, there were approximately 300 students.

¶ 31　　　　Bob testified he enjoyed a typical grandfather-granddaughter relationship with K.R. K.R. "was a very typical teenager" who enjoyed trying different activities. The two had very open communication. They saw each other often. In the summertime, Bob saw the children three to four times per week. On the weekends when they visited, Bob and his wife tried to see the grandchildren at least once. In the last two years, K.R. made it very clear she wanted to go to school in Rossville. Because the Rossville school schedule differed from K.R.'s school, there were multiple occasions when K.R., while staying with Greg, was able to attend the Rossville school with her cousin to observe.

¶ 32　　　　According to Bob, K.R.'s cousin, who was a year older, attended Rossville schools. Another cousin, A.W., was the same age and they would attend school together. K.R. and A.W. had a good relationship. Bob testified the Rossville school, for eighth graders, offered regular sports, such as volleyball, basketball, cross country, track, and cheerleading. The school had a scholastic-bowl team, a drama club, band, and chorus. Rossville did not have a dedicated art teacher. Art was incorporated by the teachers. At Rossville, each student had their own individual "Chrome pad." Lesson plans were found on those. The older students could take theirs home.

¶ 33　　　　Because he was Greg's employer, Bob agreed to allow Greg to take off the time he needed to help K.R. with her studies. Bob and his wife were very involved with their grandchildren's activities. Bob testified students moving in from larger school districts had improved vastly in the environment provided by the Rossville schools.

¶ 34                                2. *Mary Jo Ray*

¶ 35        Mary Jo, Greg's mother, testified she worked for the Rossville-Alvin school district for 29 years. She continued to work part-time for the district. Mary Jo and K.R. had a "really good relationship." K.R. indicated she wanted to live with her father and attend school in Rossville. K.R. explained she was not doing well academically in school and thought she would do better in Rossville. K.R. further liked there were more people in the family to help her with her studies. K.R. also felt bullied at her Champaign school. Mary Jo believed there were 30 students in eighth grade in Rossville, meaning each class size would be 15 students. K.R. had failed at least one class in Champaign.

¶ 36        When Greg worked late in the harvest or planting season, Mary Jo would care for the children. Typically, the bus dropped the children at Mary Jo and Bob's house. Mary Jo's house was approximately one-and-a-half miles from Greg's. When the grandchildren took the bus to her house, Mary Jo worked on homework with them.

¶ 37        Mary Jo testified the Rossville junior high school "is self-contained upstairs." During the "passing periods," there were eight supervising adults at all times. In the previous couple of years, Mary Jo had not heard of any fights. Mary Jo believed K.R. could excel in the Rossville schools.

¶ 38                                3. *Greg Ray*

¶ 39        Greg testified he resided approximately five miles from Rossville Junior High School. Greg testified Susie did not notify him of all of his daughters' activities. Greg was not informed of K.R.'s concert at the end of a rock-and-roll camp or of a Special Olympics event for W.R. Susie never informed him about any school event.

¶ 40        According to Greg, K.R. had been adamant for years about wanting to live with him and attend Rossville schools. Greg attempted to talk to Susie about K.R.'s wishes the previous summer. Susie did not respond to Greg's attempt.

¶ 41        Greg had "a multitude of concerns" about K.R.'s current school, Jefferson Middle School. Greg had been to the school "plenty of times." Greg described a time he visited K.R.'s science classroom. The room "was complete chaos." Children ran around the room. Before the parents' arrival, the students had "dissected stuff." The trays with scalpels were still on the table while the parents and children were in the classroom. There were small children there, too. No class work was being done that day. The children "play[ed] games on an iPad." On another day, "a parents day where parents could come and eat lunch with their children," Greg had lunch with K.R. A seventh grader at the table was talking about her pregnancy. Greg also had his two children, A.R. and E.R., with him. A boy sitting near them "flipped out" after a girl touched his food. He screamed obscenities. A staff worker was nearby who did little about the event, telling the boy to watch his mouth around the younger children. The lunchroom had a "deafening roar." The principal yelled over the microphone, telling the children to sit down. Greg testified, "I don't see how a child could ever sit down and have a proper day of learning anything in the environment that I witnessed every single time that I was there." The hallways were complete chaos. The children's lunch times were short. Greg was at K.R.'s school during her seventh-grade year between six to nine times.

¶ 42        As for Rossville, Greg testified the school was very quiet. The hallway was "an assembly line of order." The lunchroom was the same.

¶ 43        K.R.'s grades were "atrocious." K.R. was very smart. Each report card "went

down and down and down." A school record showed in the first half of K.R.'s seventh-grade year, K.R. had 38 unexcused tardies. In the previous year, K.R. had two in-house suspensions. One was a one-period suspension, the other was a full day—after K.R. and another student "supposedly stole a bunch of these little tickets." Greg acquired this information during a meeting with the principal. Susie did not talk to Greg about the absences or tardies.

¶ 44        Greg attempted to communicate with Susie regarding K.R.'s education multiple times. Susie would not generally respond. Greg described an incident when Susie did respond. Greg received a call from K.R. in the middle of class saying a girl was trying to fight her. Greg texted Susie, telling her he had an emergency and needed Susie to call him about K.R.'s call. Susie responded, saying she spoke to the principal. It took multiple texts and calls to reach Susie. The fact it took so long to hear from Susie concerned Greg. He tried to be involved in his children's lives. He was "all about education and making sure they stay[ed] on top of education." Greg believed K.R. was being taught that school is not that important, because K.R. did not have to be at school on time or she could miss school by pretending to be sick. K.R. told Greg school did not matter multiple times. Susie took K.R. from school to see the solar eclipse, after K.R. had been in trouble at school. Susie also took the children from school for three or four days when Susie's uncle died to spend time with relatives in Indianapolis.

¶ 45        Greg had not received any reports from the school regarding the tardies. He reported one year K.R. had over 60 tardies. He could not recall the year: "Sixth grade, fifth grade, fourth grade. I think all three of them had just about as many tardies and absences all the way back to kindergarten." Jefferson Middle School was walking distance from K.R.'s home. K.R. walked home from school. Every visit with Greg, he asked K.R. about school. K.R. would

tell him about the fights in school that the teachers could not break up and that occured almost daily. K.R. reported who her best friends were changed constantly, and they became her "worst enem[ies]."

¶ 46          According to Greg, K.R. said the girls had "pre-morning rituals" at home with Susie. They would wake around 6 a.m. K.R. complained about how tired she was. K.R. did not have time to complete her homework because she was too busy taking care of her younger sisters. Susie did not return home from work until 7 p.m. K.R. reported she did not have much homework in seventh grade. She failed the one class in which she had the most homework. K.R. reported her maternal grandmother helped K.R. with her homework.

¶ 47          According to K.R., she had chores she had to do every day after school before she could do her homework. She did not have time to complete her work.

¶ 48          As to bullying, Greg explained:

> "[K.R. will] have a best friend[.] The next thing you know, she's talking to another girl about problems, you know, that these friends have had, and the next thing you know, it gets relayed to someone and now all of a sudden, nobody is her friend anymore, you know. And this has happened two or three times last year where kids went from being her best friend to being her worst enemy, and then I would see it—when I would be in the lunchroom. [K.R.] would point out all of the different girls who had been trying to fight her and who used to be her friend and now she hates me, and this person doesn't like me anymore either."

There were lots of threats about fights. One girl wrote K.R. a note about what she planned to do to K.R., who then told Greg about the note. He did not learn about it from Susie or the school. K.R. was extremely upset. Greg went directly to the school about the note. He heard the girl was suspended.

¶ 49 Greg had two younger children who attended school in Rossville-Alvin. A.R. would be entering second grade and E.R. was beginning kindergarten. K.R. was "super close" to her half siblings. K.R. enjoyed watching them. She read books to them. K.R. was "very, very close" with her cousin who was a freshman in the Rossville-Alvin schools. K.R. attended a Rossville-Alvin school for "a couple days" when Champaign schools were out of session. K.R. could not believe how quiet the school was.

¶ 50 Greg worked with K.R. every weekend she was with him and had homework. Most of the time, however, K.R. reported having no homework. Rarely did she bring her school bag with her. Greg had an associate's degree in science and, he believed, another in math. Greg had 160 credit hours but did not have a bachelor's degree "because they don't all fall into one category." K.R.'s uncle, who resided near Greg, was a teacher's aide in math. He would assist K.R. as necessary.

¶ 51 According to Greg, his work schedule as a farmer would not negatively affect K.R.'s educational needs. Planting and harvest seasons were approximately three to four weeks of intense work, but they always made time for the other things they needed to do. They were always done before supper and had plenty of time for schoolwork.

¶ 52 Greg's children, E.R. and A.R., lived primarily with him. They stayed with their mother every other weekend and every other week in the summer. Greg's relationship with

E.R.'s and A.R.'s mother was "great." When she dropped off the children, she usually spent 15 or 20 minutes talking about the children. If K.R. lived primarily with Greg, he proposed a schedule that was the same as E.R. and A.R. For W.R., she would visit on alternate weekends to allow the four of them to be together.

¶ 53 Greg was seeking primary decision-making responsibilities so K.R. could go to school in Rossville. Greg stated he would provide Susie notice of all events. He was not seeking joint decision-making as Susie, in 2014, said it did not work for them. Susie would never make a concession from the schedule. For example, Greg's grandfather died the previous June. The girls were not scheduled to be with him over the funeral time. Lawyers had to be called. Susie refused to let them go unless he gave her two days in return for her six hours. Greg explained another issue that arose while he was going through his divorce with E.R.'s and A.R.'s mother. Greg informed Susie he was going to be a little late getting the summer schedule to her. She said that was fine. When he gave the schedule to her, however, he received a motion from an attorney stating the schedule was late and was being contested. Susie had sought an additional week in the summer to send the kids to a camp.

¶ 54 K.R. could not wait to start school in Rossville. She was "super excited for it." K.R. had a lot of good friends there she had known since she was little. K.R. could not have been more excited for school. K.R. did not want to return to Jefferson Middle School. K.R. did not get along with her mother. K.R. told Greg that Susie curses at her often. With the hearing approaching, Susie's approach toward K.R. changed. Susie began sending K.R. pictures of a new bed for K.R. She was getting K.R. "all this stuff she want[ed]."

¶ 55 On cross-examination, Greg stated he had not spent a whole day at K.R.'s school

with her. Greg believed K.R.'s school day started at 7:30 a.m., but he did not know for certain. He did not know what time she was dropped off at school. He did not know how many times a week K.R. was dropped off to participate in the breakfast program at school. A number of the tardies occurred for periods in the middle of the day. Greg acknowledged it was K.R.'s responsibility to get to those periods on time. K.R. had a cellphone.

¶ 56 Greg had visited the webpage for K.R.'s school. He had not, however, registered for notifications from the school. Before November 5, 2018, he had not had a conference with K.R.'s principal. He hired a tutor, his aunt, to tutor K.R. and W.R. during the summers.

¶ 57 During the previous school year, Greg learned Susie had confiscated K.R.'s phone for disciplinary reasons. While with Greg, K.R. purchased a phone with her money. Greg did not tell Susie about this purchase. He did not provide the phone number to her. Greg did not know that K.R. had used that phone inappropriately at school. K.R. did not tell Greg about this. K.R. did not talk to Greg about her one-hour in-school suspension. She did not tell him about the unexcused tardies. K.R. did, however, tell Greg about the half-day suspension.

¶ 58 Greg acknowledged the following texted conversation with K.R.:

"GREG: Nice, don't answer. Forget about the party.

K.R.: Okay.

GREG: Call me back and explain.

K.R.: Stop calling. I'm not with my mom and I'm trying to study for a French [t]est with my friend. I love you[,] and we'll talk later.

GREG: Real nice. I gu[e]ss time with dad doesn't matter.

K.R.: It did. I never said that[,] and I never will.

GREG: You shou[l]d see how upset your brother and sister

are[. Y]our mother [doesn't] care and never will."

¶ 59 Greg testified he preferred the children not wear shoes in the home. He explained, because they lived on a farm, he did not want excrement tracked inside. He acknowledged both girls had been prescribed orthotics to go inside their shoes and help with growth and development.

¶ 60 At the time Greg filed his petition to modify, he did not know Susie had involved K.R. with Sylvan Learning Center. He did not know Susie hired a private tutor. He also did not know Susie arranged for K.R. to attend the after-school homework center.

¶ 61 Greg stated his proposed parenting time would allow K.R. and W.R. to spend every weekend together. W.R. told Greg she was comfortable staying with her mother.

¶ 62 On redirect examination, Greg explained a situation at the Champaign schools involving W.R. W.R. had been bullied by boys who were telling her to kill herself. Greg went to the school and talked to an administrator about moving W.R. and fixing the problem. After Greg's visit, the bullying stopped. Greg testified K.R. had 70 tardies in second grade and 52 in third grade.

¶ 63                                    4. *Terren Wilson*

¶ 64 Wilson testified she taught two subjects at Jefferson Middle School, seventh-grade writing and Advancement Via Individual Determination (AVID), a college preparatory course. To take an AVID course, a student had to be enrolled in an honors course. K.R. had been in Wilson's AVID class and writing class. K.R. was in Wilson's first-hour and fourth-hour

classes. According to Wilson, K.R. was very quiet in class and she worked hard. In writing class, K.R. had gotten all of her work done. K.R. had a little more trouble with AVID, as it was more course intensive. There was a lot more homework in AVID. Wilson did not recall any attendance issues. K.R. did not usually participate in classroom discussions. K.R. appeared to get along with the students in her classes. Wilson observed no bullying behavior.

¶ 65     According to Wilson, she spoke with Susie "quite a bit" about the AVID coursework. Susie would typically email Wilson about whether assignments were turned in. When Wilson made recommendations to Susie, Susie followed them. As for student behavior, Wilson's AVID classes "were pretty calm." It was a first-hour class, so the children arrived a little tired. In addition, there was "a really positive community in AVID." As for the writing class, it was a smaller group. Wilson believed there were typically no behavioral issues in those classes either. K.R. never indicated she was unable to concentrate.

¶ 66     On cross-examination, Wilson testified every Tuesday and Thursday AVID students were to come prepared with a tutorial request form so they could participate in a tutorial. K.R. completed just one of six of those forms.

¶ 67                         5. *Cody William Gayhart*

¶ 68     Gayhart was a French teacher at Jefferson Middle School. K.R. was in his third-hour French class her seventh-grade year. Gayhart was familiar with Susie. They knew each other through interactions at school, through email, and, a few times, seeing each other at church. He had contact with Greg once.

¶ 69     Gayhart described K.R. as a rule follower. There were a few times she had to be redirected or reminded of the expectation, but K.R. would listen. K.R. usually completed her

- 18 -

homework. K.R. was usually in class. She did not participate as much as Gayhart would have liked. K.R. socialized in class and seemed happy. Gayhart did not observe anyone bullying K.R. He engaged in emails and calls with Susie. The email communications were about AVID. Gayhart "had to raise [his] concern that K.R. was not doing as well as earlier in the year." After one email, Susie arrived 10 minutes later. She agreed to help K.R. In April 2019, Gayhart emailed Susie about K.R.'s spending time during class distracted by her phone or her makeup during class. Susie emailed apologizing. She asked where K.R. stood in class and how to help her better. Gayhart responded: "I would say that she hasn't learned much French the second semester due to her phone and general attitude to school which has been less than stellar."

¶ 70　　　　Gayhart described his classroom as "usually quiet." There was no fighting in his class. K.R. usually did not have attendance problems in Gayhart's class. There were a few times she was late.

¶ 71　　　　On cross-examination, Gayhart testified he did not remember a parent-teacher conference with Greg. Gayhart was aware of a situation with K.R. and a classmate. Gayhart did not address it because the matter was being handled outside the classroom. Gayhart believed K.R. was late a few times. He believed Susie was contacted about it. Students would be given lunch detentions because of the tardiness. Once in a while, K.R. would serve lunch detention.

¶ 72　　　　On redirect examination, Gayhart had talked to K.R. about her tardiness. K.R.'s explanations were similar to other middle schoolers, such as being in the bathroom. K.R. accepted responsibility for her tardiness.

¶ 73　　　　　　　　　　　　　　6. *Todd Griffith*

¶ 74　　　　Griffith, a school counselor at Jefferson Middle School, testified he was familiar

- 19 -

with K.R. She was one of his students. He was also familiar with Susie but had never met or talked to Greg. The school had a zero-tolerance policy for bullying. When the administration learned about bullying, usually the parents were contacted and a meeting occurred.

¶ 75 Griffith had some interaction with K.R. He wanted to keep the contents of the interaction confidential. K.R. had sought Griffith out as a counselor multiple times. She was open with her concerns. She appeared comfortable. Griffith was aware K.R. had been the victim of bullying. The associate principal informed Griffith another student had written a letter about K.R. Griffith talked to both K.R. and Susie about the situation. Griffith believed Susie complied with the recommendations made to her. The bullying stopped. When asked if K.R. informed Griffith of the improvement, he answered, "I would say yes, but not necessarily face[-]to[-]face like in the office area." Griffith observed the children interact. "[T]hey were becoming a little closer as far as friends again." Griffith and Susie communicated about K.R.'s academics. The two discussed K.R.'s schedule to ensure she was registered for appropriate coursework. Susie sent multiple emails ensuring K.R. was registered for French and AVID.

¶ 76 On cross-examination, Griffith admitted to emailing Susie and not Greg about the incidents. He did so because he did not have Greg's email address. He did not ask for Greg's email address. He believed Susie may have emailed him first.

¶ 77 Griffith was aware of bullying in the seventh grade with some of the same people. He did not contact either parent. He talked with K.R. in passing, as in the cafeteria or hallways, regarding that situation.

¶ 78 *7. Illyanna Lopez*

¶ 79 Lopez testified she was K.R.'s seventh-grade math teacher. K.R. did not have

attendance issues in her math class. K.R. completed assignments on time. She completed all but one of her tests. Lopez believed K.R. did not even start the test she failed to complete. K.R. appeared to get along with her classmates. She answered questions when called on, but she was "[n]ot a big volunteerer." Lopez noticed an improvement in K.R. over the school year. She began to speak more and she was more confident. Lopez credited the fact that she had a math tutor.

¶ 80        Lopez knew both of K.R.'s parents. When asked about her contact with Greg, she explained there was a phone call, one email, and once in person in passing at a school open house. The call and email occurred in the fall. Those communications were regarding K.R.'s grades and log-in information to access her grades. Regarding Susie, Lopez communicated with her in person, through email, by phone calls, and at conferences. The discussions were regarding academics. She recalled seeing Susie at school to decorate K.R.'s locker for her birthday. Susie asked for advice and followed Lopez's advice.

¶ 81        Lopez described the atmosphere in her classroom. The class period had "[a] little bit of peer interaction, a little bit of teacher instruction[,] and then work time." At times, the children could be unruly. When the children worked on assignments, the classroom was not quiet. She encouraged dialogue over the math questions.

¶ 82        On cross-examination, Lopez stated there were 25 to 30 students in her class. Lopez was only aware of one instance of bullying in her class. After K.R. did not start or complete the math test, Lopez met with Susie. Lopez did not contact Greg about the test. K.R. was given the opportunity to retake the examination. Susie asked K.R. the reason she did not start the exam. K.R. reported she was nervous.

¶ 83                                  9. *Susie Ray*

¶ 84    Susie testified she maintained contact with the school through the years. When asked about the photos of the new bed for K.R., Susie explained K.R.'s "new" bed was one "new to her" that she acquired from a friend for free. As of the second quarter of K.R.'s seventh-grade year, she had mostly C's and a D in writing. K.R.'s grades went down between then and the end of the year.

¶ 85    Susie explained the bullying incidents. One that occurred at the beginning of the school year involved a girl K.R. had known for "the past couple years." The bullying began when K.R. wore crocheted braids in her hair. The friend "cussed [K.R.] out and told her she was doing cultural appropriation because she had this hairstyle." The girl talked badly about K.R. They were, by the end of the year, friends again. Susie did not remember the other incident.

¶ 86    Susie agreed K.R. struggled with her schoolwork. Susie paid for websites to help. Susie reached out to tutors and went to the school for extra help. One tutor came to the house about three times a week. Susie took K.R. to Sylvan Learning Center. Susie also had K.R. do additional academic work. Susie had K.R. read and then write summaries of what she read.

¶ 87    At the beginning of the school year, K.R. had gotten a failing grade. When K.R. returned from her dad's house, Susie took her phone as punishment. Susie explained she could not have a phone if she had failing grades. Susie learned Greg had helped K.R. get a new phone when Susie received a call from the school. According to the school, K.R. was recording a teacher on the phone. Susie responded that was not possible as she had taken K.R.'s phone. Susie then found K.R.'s new phone among her belongings.

¶ 88    Susie drove K.R. to school in the mornings. She was dropped off by 7:30 or 7:40 a.m., before the first bell rings. Susie had discussed K.R.'s absences or late appearances with

K.R. K.R. explained she was late as she was having breakfast in the cafeteria or she was in the bathroom. To address the tardiness issue, Susie and K.R. came up with a contract with the attendance monitor. The agreement was something to the effect of K.R. could choose a consequence and a reward. For being late, K.R. would do 10 pushups for the attendance monitor. As a reward of one month of no tardies, Susie would take her out to dinner.

¶ 89 Susie recalled receiving an emergency text about the same girl who had been bullying K.R. earlier in the year. At the time she received the message, Susie was in the middle of massaging a client. She did not want to leave her client. She informed Greg the issue had been addressed.

¶ 90 Susie testified she contacted the school after the massage session. She spoke to "Ms. Franklin," who "dropped everything, ran down to the classroom and thought there was a fight in session and she, in fact, said that there was no fight." The children were taking a test, and the entire class was quiet.

¶ 91 K.R. had participated in a number of extracurricular activities. She was involved in dance, gymnastics, piano lessons, voice lessons, and instrumental lessons. The school had recitals and Christmas programs. Greg attended some of those activities. Greg did not assist in paying for those activities.

¶ 92 Susie believed the Champaign schools were better for K.R. Susie reasoned Champaign had more to offer. In addition, she could be with her sister. Jefferson Middle School had an art club. Susie believed it was important for K.R. to return to the same environment she had been attending school and K.R. was learning appropriate life skills. Some of the bullying incidents guided her to develop different ways to resolve the incidents. She had good friends of

different racial and economic backgrounds. Susie believed it would be difficult for W.R. and K.R. to not have as much time together.

¶ 93    Susie explained she did not have K.R. babysit her siblings. Susie usually finished work around 2 p.m. At times, she worked until 4 p.m. or 5 p.m.

¶ 94    On cross-examination, Susie testified she had morning routines for the family. W.R. and K.R. ate breakfast at their schools. Susie provided food in the mornings for the kids. K.R. enjoyed art. She did not take an art class in seventh grade.

¶ 95    Susie and K.R. had not gone out to eat together as a result of the incentives. K.R. had 47 tardies in seventh grade. Susie paid K.R. as an incentive to read. She would get $20 per "chapter book." For "leadership books," K.R. was paid $25. These incentives started the past year. They also had an arrangement by which Susie agreed, if K.R. had certain grades, they would go to Texas. K.R.'s grades improved a little at first.

¶ 96    Susie resided in an apartment with her daughters. Susie did not recall telling K.R. Christmas would be canceled and K.R.'s grandparents' retirement plans would be postponed as a result of Greg's motion to modify. She admitted she could have said something like that because she was emotional. Susie said she had been working hard to repay a loan her mother made to her.

¶ 97    K.R. was enrolled at Jefferson Middle School. Susie did not inform Greg she had enrolled her in the fall semester. When Susie informed K.R. she had been enrolled there, K.R. "was fine." The two had gone school shopping. When asked if she was aware K.R. had a strong preference to attend Rossville-Alvin schools, Susie said K.R. "mentioned it just recently." Susie denied that it was a "strong preference."

¶ 98    C. The Trial Court's Order Denying the Modification

¶ 99    Promptly after the hearing on Greg's motion, the trial court denied the motion. In so doing, the court prepared a lengthy memorandum opinion, explaining its analysis. The court began its analysis by commenting on the credibility of the witnesses. First, the court commented on the parties:

> "Both parties have an interest in the outcome of the case and both are biased against each other. As to Susie, she at times contradicted other testimony. For instance, Greg, his parents[,] and the LGAL all indicated that K.R. stated long ago that she very much wanted to go to Rossville schools. Susie, on the other hand, said it was recent and not a strong preference. As to Greg, his manner of testifying clearly showed what Susie, Greg's ex-wife and the LGAL stated—he has a temper. He was angry, talking over the questioner, answering beyond the question, etc. More importantly, though, the Court was concerned about his black[-]and[-]white view of the world—Rossville schools are great and Champaign schools are horrible, Susie rarely gave him information (although he had access to get it himself), etc."

As to Greg's parents and the teachers and counselors, the court found the following:

> "Greg's parents appeared sincere but have bias and an interest in this case as well. They, like their son, also portrayed the Rossville schools in an unrealistic light. The teachers and counselor who testified for Susie were disinterested. They did not appear to favor

- 25 -

one side or the other and testified only about their observations. The Court finds them credible. The only comment is about Ms. Wilson, [K.R.'s] first[-]period teacher, who said that tardies were not a problem for K.R. This appears to contradict [the exhibit that] showed numerous unexcused tardies for the first period; this may well indicate that K.R. is just a few moments late to class."

The court found Susie and her witnesses more credible than Greg and his witnesses.

¶ 100     The trial court found a substantial change of circumstances had occurred. The court observed since the October 2014 judgment awarding Susie custody of K.R., the number of absences and tardies had increased. Since that time, K.R. had been bullied and had at least two in-school suspensions.

¶ 101     The trial court noted the statutory obligations to allocate the decision-making responsibilities based on K.R.'s best interest. The court noted the statutory factors it must consider and did consider when making its ruling. The court specifically listed each statutory factor and provided analysis for each one.

¶ 102     As to K.R.'s wishes, the trial court found this factor favored Greg. The court found the factor of wishes of the parents favored neither party. The court noted when Greg visited Jefferson Middle School and found it chaotic, "most of the time he went there, they were open-house-type days when there was less structure." As to K.R.'s adjustment to home, school, and community, the court found as to this factor: "[a]djustment to home is a wash, to school slightly to Greg[,] and [to] community slightly to Susie." Regarding the child's needs factor, the court found the factor favored Susie. The court observed Susie made efforts to talk to teachers

and staff, hired tutors, and provided incentives to K.R., while Greg, while complaining Susie did not provide him educational information, failed to avail himself of the equal access to school records and information or to contacting the teachers. Regarding the factor of the distance between the residences, the court found the factor slightly favored Susie as Greg had a restricted driver's license requiring his family to help transport K.R.

¶ 103    As to the factor of the level of each parent's participation in past significant decision making with respect to K.R., the court observed Susie had the sole decision-making role since 2014. Susie made the doctor appointments, parent-teacher conferences, enrolled K.R. in school and activities. The court concluded this factor favored Susie.

¶ 104    The court analyzed the additional factors that applied to parenting time. Regarding the amount of time each parent spent performing caretaking functions, the court found the factor favored Susie, as K.R. spent the majority of her time with Susie. The court found one factor favored Greg: the willingness and ability of each parent to place K.R.'s needs ahead of his or her own. Under this factor, the court noted two troubling incidents concerning Susie: "First, Greg testified that he wanted to keep K.R. for an additional 6 hours of parenting time so she could attend a relative's funeral. Susie did not allow that to occur. Second, after Greg filed his Petition to Modify, Susie admitted to telling K.R. that Christmas might have to be canceled and her grandparents['] retirement postponed."

¶ 105    In reaching its conclusion, the trial court indicated he considered the report of the LGAL. The court observed the LGAL found the case to be extremely close. The court quoted the LGAL as stating: "Hopefully, a fresh start at a different school will be a positive change for K.R., although, whether or not she takes advantage of a fresh start is very much up to her." The

court observed it had great respect for the LGAL and took the recommendations seriously.

¶ 106      The court observed it had decided not to interview K.R. *in camera*. The court found it had sufficient evidence about her preference through the LGAL's report and through other witnesses. The court found the tardiness was due to K.R.'s choices and not to Susie.

¶ 107      Regarding the school, the trial court stated the following:

> "A major argument of Greg's is that Jefferson is not a good school and does not provide a good environment for K.R. to learn. The teachers testified to the contrary about how the classrooms are quiet and they give K.R., and [Susie], support. Greg also argues that [Susie] creates an environment at home that leads K.R. to believe that education is not important. There was little evidence to support this claim that [Susie] forces K.R. to babysit and do other chores or that K.R. and [Susie] fight all the time. The evidence is the opposite—that she talks to teachers, makes goals with K.R. and obtains tutors."

Before finding it in K.R.'s best interest for Susie to continue to have the majority of parenting time and all major decision-making, the trial court stated the following:

> "This is a difficult case for the Court because both parties love K.R. and want what is best. Each has slung accusations against the other about their parenting skills. Some of the statutory factors favor [Susie] and others favor Greg. Some favor neither

party. It is not a question of which party has more factors in their favor—it is a best[-]interest determination based on all the facts and circumstances of the case. This Court is fully aware that K.R. wants to go to Rossville schools. Her wishes are just one factor for the Court to consider. There are many other factors for the Court to consider. K.R. has had [ ] trouble with grades and attendance for years. Much of the responsibility falls on K.R.—she talks in class, she uses her phone inappropriately, she stays in the bathroom and is late to class. She has made goals for herself but she has not met them. [Susie] has been in frequent contact with teachers and tutors to find the best way to help K.R. She has taken all their recommendations. Bullying, which can occur anywhere and anytime, has mostly been conflicts with her own friends. It is not a current problem. The staff and teachers at Jefferson care about [K.R.'s] success and will continue to work with her. This will be [K.R.'s] final year at Jefferson. She has friends there and [W.R.] will be at the same school with her for the first time in years.

It might be true that K.R. will do better in Rossville schools due to its different environment. But that is speculative. No teachers or administrators testified about details of their programs or support that they offer to students (Greg's father testified in general terms only). The Court is sympathetic to Greg's concerns

about the learning environment at Jefferson. He has been there briefly and teachers at the school describe it differently. Much of Greg's opinion is guided by [K.R.'s] comments to him—in particular that she wants to be in Rossville. The Court believes he is sincere in wanting what is best for his child.

There exists a strong presumption in favor of maintaining the status quo in custody arrangements. The rationale behind this presumption is that stability is important in the lives of children. [Citation.] Although the parties can help, [K.R.'s] success is determined by K.R. herself. There is little in the record that [Susie] has not appropriately acted in [K.R.'s] best interest to provide her a good education, tutoring and the ability to participate in activities. When all is said and done, Rossville schools would simply offer K.R. a fresh start. As the LGAL stated, 'Hopefully, a fresh start *** will be a positive change for K.R., although, whether or not she takes advantage of a fresh start is very much up to her.' The *hope* that K.R. takes advantage of a fresh start is insufficient grounds to find it is in her best interest to change decision-making and where she lives the majority of the time." (Emphasis in original.)

¶ 108  This appeal followed.

¶ 109                          II. ANALYSIS

- 30 -

¶ 110                        A. Statutory Language and the Standard of Review

¶ 111          Section 610.5 of the Illinois Marriage and Dissolution of Marriage Act (Marriage

Act) (750 ILCS 5/610.5 (West 2018)) authorizes the filing of motions to modify orders

allocating parental decision-making responsibilities and parenting time. Parenting time may be

modified at any time upon a showing of changed circumstances necessitating modification to

serve the child's best interests. *Id.* § 610.5(a). Before modifying parenting time, the court must

find, by a preponderance of the evidence, a substantial change of circumstances occurred and a

modification is necessary to serve the child's best interests. *Id.* § 610.5(c).

¶ 112          The Marriage Act provides statutory factors that must be determined when

assessing how to allocate decision-making responsibilities and parenting time. In allocating

decision-making responsibilities, the court must do so according to the child's best interests. 750

ILCS 5/602.5(a) (West 2018). When determining the best interests of the child, the court must

consider the following:

> "(1) the wishes of the child ***;
>
> (2) the child's adjustment to his or her home, school, and
> community;
>
> (3) the mental and physical health of all individuals
> involved;
>
> (4) the ability of the parents to cooperate to make decisions,
> or the level of conflict between the parties that may affect their
> ability to share decision-making;
>
> (5) the level of each parent's participation in past

- 31 -

significant decision-making with respect to the child;

(6) any prior agreement or course of conduct between the parents relating to decision-making with respect to the child;

(7) the wishes of the parents;

(8) the child's needs;

(9) the distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and the child's daily schedules, and the ability of the parents to cooperate in the arrangement;

(10) whether a restriction on decision-making is appropriate under Section 603.10;

(11) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child;

(12) the physical violence or threat of physical violence by the child's parent directed against the child;

(13) the occurrence of abuse against the child or other member of the child's household;

(14) whether one of the parents is a sex offender, and if so, the exact nature of the offense and what, if any, treatment in which the parent has successfully participated; and

(15) any other factor that the court expressly finds to be

relevant." *Id.* § 602.5(c).

¶ 113     Like parental decision-making responsibilities, parenting time is allocated according to the child's best interest. 750 ILCS 5/602.7(a) (West 2018). The court must consider the following statutory factors, which are similar to those for parental decision-making responsibilities:

"(1) the wishes of each parent seeking parenting time;

(2) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to parenting time;

(3) the amount of time each parent spent performing caretaking functions with respect to the child in the 24 months preceding the filing of any petition for allocation of parental responsibilities or, if the child is under 2 years of age, since the child's birth;

(4) any prior agreement or course of conduct between the parents relating to caretaking functions with respect to the child;

(5) the interaction and interrelationship of the child with his or her parents and siblings and with any other person who may significantly affect the child's best interests;

(6) the child's adjustment to his or her home, school, and community;

- 33 -

(7) the mental and physical health of all individuals involved;

(8) the child's needs;

(9) the distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and the child's daily schedules, and the ability of the parents to cooperate in the arrangement;

(10) whether a restriction on parenting time is appropriate;

(11) the physical violence or threat of physical violence by the child's parent directed against the child or other member of the child's household;

(12) the willingness and ability of each parent to place the needs of the child ahead of his or her own needs;

(13) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child;

(14) the occurrence of abuse against the child or other member of the child's household;

(15) whether one of the parents is a convicted sex offender or lives with a convicted sex offender and, if so, the exact nature of the offense and what if any treatment the offender has successfully

participated in; the parties are entitled to a hearing on the issues raised in this paragraph (15);

(16) the terms of a parent's military family-care plan that a parent must complete before deployment if a parent is a member of the United States Armed Forces who is being deployed; and

(17) any other factor that the court expressly finds to be relevant." *Id.* § 5/602.7(b) (West 2018).

¶ 114　This court will not reverse an allocation of decision-making responsibilities unless the determination is against the manifest weight of the evidence. *Young v. Herman*, 2018 IL App (4th) 170001, ¶ 64, 92 N.E.3d 1070. A strong and compelling presumption favors the trial court's result as that court sits in the better position to consider and weigh the evidence and to determine the child's best interests. *Id.* We find a trial court's allocation of parenting time, which was formerly part of a custody determination like "decision-making responsibilities" (see *id.*), is reviewed under the same standard. See *In re A.S.*, 394 Ill. App. 3d 204, 214, 916 N.E.2d 123, 132 (2009). A determination "is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." *Best v. Best*, 223 Ill. 2d 342, 350, 860 N.E.2d 240, 245 (2006).

¶ 115　　　　　　　　　　B. The Denial of the Petition to Modify

¶ 116　Greg argues the court's denial of his motion to modify is against the manifest weight of the evidence. Greg makes three key arguments in support of his contention.

¶ 117　First, Greg contends the trial court erred in not considering the quality of the school K.R. would attend if she lived with Greg. Greg points to the trial court's concerns over

- 35 -

Greg's "black and white view of the world—Rossville schools are great and Champaign schools are horrible ***."

¶ 118    We find no error in the trial court's consideration of the schools. The court, in addressing the statutory factors, plainly recognized the case was "mostly about education." The court's thorough and lengthy order demonstrates the court considered the evidence presented as to the quality of the Rossville schools. The court noted Bob's testimony that "the hallways are orderly, there are quiet classrooms" and Mary Jo's testimony the Rossville schools would provide more support for K.R. The court, however, after hearing the testimony from all the witnesses, found Jefferson Middle School to not be the school Greg described. The court further noted there was no testimony from teachers or administrators from Rossville schools to provide details about their programs. The court's conclusion more weight should not be given to the evidence related to the Rossville schools is not "unreasonable, arbitrary, or not based on the evidence presented." *Id.* at 350.

¶ 119    Second, Greg argues the trial court did not give sufficient weight to the recommendation of the LGAL. We disagree. The court provided thoughtful analysis of the LGAL's recommendation. In its conclusion, the court began by noting it considered the report of the LGAL. The court observed the LGAL found the case to be extremely close. The court noted the LGAL opined, "Hopefully, a fresh start at a different school will be a positive change for K.R., although, whether or not she takes advantage of a fresh start is very much up to her." The court considered the statutory factors. The court gave extensive analysis of the testimony in the case and concluded "The *hope* that K.R. takes advantage of a fresh start is insufficient grounds to find it is in her best interest to change decision-making and where she lives the majority of the

time." (Emphasis in original.) Greg has not shown the LGAL's decision should overcome the evidence that Susie hired tutors and worked with Jefferson Middle School to meet the educational needs of her daughter and the stability of K.R.'s current arrangement should be disrupted for the hope K.R. would improve. We note the LGAL made his recommendation with some reservation. We are not convinced the trial court's decision is against the manifest weight of the evidence.

¶ 120 Third, Greg contends the trial court erred by not giving proper weight to K.R.'s strong preference to live with Greg. Greg contends there was no evidence to suggest K.R.'s reasoning was not sound or improper. He emphasizes the testimony of the witnesses, including Susie, show K.R. desired to live primarily with Greg and attend Rossville schools. And, according to Greg, given the testimony about the bullying and disorder at the Champaign schools, the trial court should have acceded to K.R.'s preference.

¶ 121 The Marriage Act requires the trial court to consider "the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to parenting time." 750 ILCS 5/602.7(b)(2) (West 2018). As Greg argues, K.R. was clear on her preference to reside primarily with Greg. However, as the trial court observed, K.R.'s preference was just one factor to be considered, and the trial court did consider it among all of the factors. The court was well aware of K.R.'s preference. The court was also aware, however, of facts that showed K.R.'s "maturity and ability to express reasoned and independent preferences" lessened the weight of her choice. The evidence shows Susie believed K.R.'s preference was due to Greg's less strict parenting style. The testimony showing Greg allowed K.R. to purchase a cell phone to replace the one Susie had taken from K.R. for disciplinary

reasons and told K.R. to hide it from her mother supports Susie's belief. The LGAL, though convinced K.R.'s preference was legitimate, opined K.R. appeared to have been trained in how to respond to the reasons for her wishes to attend Rossville schools. K.R.'s behaviors do not support the contention her maturity requires greater weight to be given to her preference. K.R. had trouble with grades and attendance for years. She talked in class, used her phone inappropriately, and was late to class.

¶ 122    We are not convinced due consideration was not afforded to K.R.'s preference to live with Greg and attend Rossville schools.

¶ 123    The trial court addressed each of the statutory factors. The court thoughtfully considered and addressed the testimony of the witnesses, the LGAL report, and the exhibits filed. As the trial court concluded, this was a close case. Despite the history of falling grades and attendance issues—issues that preceded the 2014 parenting agreement—the decision to give K.R. the stability of staying in the school she already attended, with teachers and administrators working to help her address her educational and social needs, is not against the manifest weight of the evidence. We give deference to the trial court's determination, as it viewed the witnesses during their testimony and was better suited to determine credibility. See *Young*, 2018 IL App (4th) 170001, ¶ 70. And, here, the trial court found Susie and her witnesses more credible than Greg and his.

¶ 124    The trial court did not err in denying Greg's motion to modify.

¶ 125                III. CONCLUSION

¶ 126    We affirm the trial court's judgment.

¶ 127    Affirmed.