2025 IL App (4th) 250467-U

NO. 4-25-0467

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

FILED
September 19, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| JAMIE G., | ) | Appeal from the |
| Petitioner-Appellee, | ) | Circuit Court of |
| v. | ) | Peoria County |
| JONATHAN W., | ) | No. 17F271 |
| Respondent-Appellant. | ) | |
| | ) | Honorable |
| | ) | Caroline Borden Campion, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court.
Presiding Justice Harris and Justice Grischow concurred in the judgment.

**ORDER**

¶ 1    *Held:*    The trial court's decisions to (1) grant petitioner's petition to relocate and
(2) deny respondent's motion to modify allocation of parenting responsibilities
and parenting time were not against the manifest weight of the evidence.

¶ 2    In January 2019, petitioner, Jamie G., and respondent, Jonathan W., entered an

agreed parenting plan for the care of their child, J.G. (born November 2013). Pursuant to that

agreement, Jamie, who lived in Brimfield, Illinois, was designated the primary caregiver of J.G.

and Jonathan, who lived in Peoria, Illinois, received parenting time on alternating weekends and

weekly on Wednesday evenings. In February 2019 and January 2022, the trial court made minor

modifications to Jonathan's weekday parenting time to account for J.G.'s school hours and summer

break.

¶ 3    In May 2024, Jamie filed a petition to relocate, requesting the trial court allow her

and J.G. to move to Macomb, Illinois. The court appointed a guardian *ad litem* (GAL), who filed

a written report in November 2024 recommending that Jamie's petition be granted.

¶ 4    In December 2024, Jonathan filed a petition to modify the allocation of parental responsibilities and parenting time, requesting that he be allocated primary parental decision-making authority and primary residential parent status, with a majority of the parenting time.

¶ 5    In January 2025, following a hearing, the trial court granted Jamie's petition and denied Jonathan's petition.

¶ 6    Jonathan appeals, arguing that the trial court's decisions (1) to grant Jamie's petition for relocation and (2) to deny Jonathan's petition to modify were against the manifest weight of the evidence. We disagree and affirm.

¶ 7                                    I. BACKGROUND

¶ 8                                    A. Procedural History

¶ 9    In November 2013, Jamie gave birth to J.G. In 2017, Jamie filed in the trial court a "Petition to Determine the Existence of the Father and Child Relationship" between Jonathan and J.G. Jamie and Jonathan submitted to DNA testing by agreement, and in June 2017, the court entered (1) a judgment of parentage finding Jonathan was the natural father of J.G. and (2) an order directing him to pay child support.

¶ 10    In September 2018, Jonathan filed a "Petition for Allocation of Parenting Time and Parental Decision Making Responsibilities," alleging that Jamie was not allowing him to see J.G. and requesting the trial court enter an order allocating parental responsibilities and parenting time.

¶ 11    In January 2019, Jonathan and Jamie entered an agreed parenting plan pursuant to which J.G. would (1) remain primarily in the care of her mother in Brimfield, Illinois, and (2) visit with Jonathan every other weekend and every Wednesday evening. The plan also (1) provided that Jamie and Jonathan would each receive two nonconsecutive weeks with J.G. each summer and

(2) set forth a schedule for holidays, birthdays, and school breaks that generally provided each parent equal time with J.G.

¶ 12    In February 2019, following a hearing on "remaining issues" not addressed in the agreed parenting plan, the trial court entered an order extending Jonathan's Wednesday evening parenting time to overnight, and ending Thursday mornings when he would drop J.G. off at school.

¶ 13    In January 2022, following a hearing on a rule to show cause filed by Jamie alleging, in relevant part, that J.G. had missed six out of eight Thursday school days because Jonathan failed to drop her off, the trial court entered an order modifying Jonathan's Wednesday visits to (1) evenings only during the school year and (2) overnight during summer breaks.

¶ 14    In May 2024, Jamie filed a "Petition for Temporary and Permanent Relocation of Minor Child," which is the subject of this appeal, requesting to relocate J.G. to Macomb, Illinois, to live with Jamie and her "long-term serious" boyfriend, Alex P. Jamie alleged that she and Alex "wish[ed] to be engaged" but had not yet taken that step. She also alleged that the proposed relocation (1) was 69.8 miles away from Jamie's current residence in Brimfield, (2) would allow J.G. to live in a bigger residence, (3) would allow Jamie to find employment "similar to or better than" her current employment, and (4) would benefit J.G. financially because Jamie's expenses would decrease, resulting in more monthly discretionary income.

¶ 15    Jamie proposed allowing Jonathan additional time with J.G. during the summer to make up for "the loss of his Wednesday parenting time." She asserted that his alternating weekend and holiday visit schedule could remain the same.

¶ 16    In July 2024, the trial court appointed a GAL, Caryn Kamp, to represent J.G.'s interests relative to Jamie's petition. Kamp conducted an investigation and, in November 2024, filed an 11-page written report recommending that Jamie's petition to relocate be granted. Kamp

wrote in her report that the case "involve[d] a close decision" because some of the statutory relocation factors in section 609.2(g) of Illinois Marriage and Dissolution Act (Act) (750 ILCS 6/609.2 (West 2024)) weighed against relocation, while others weighed in favor, but she ultimately concluded that the case "comes down to [(1)] the distance of the relocation and [(2)] the ability of the Court to fashion a parenting time schedule for the parties to minimize the impact on the Father-child relationship." Specifically, the GAL noted that (1) "the underlying move is only slightly above the relocation threshold of fifty (50) miles" and (2) Jonathan was not currently employed and had the ability to drive for important events, even if they occurred during midweek. Kamp suggested that Jonathan could exercise his midweek visit in the Macomb area by taking J.G. out to dinner or an activity and also suggested that he be granted weekly midweek video visits.

¶ 17        In December 2024, Jonathan filed a "Petition to Modify Allocation of Parental Responsibilities and Parenting Time," alleging that a "substantial change in circumstances" had occurred since the entry of the January 2022 parenting time order—namely, that (1) Jamie had filed her petition to relocate J.G. to Macomb and (2) Jamie was not acting in J.G.'s best interest by "making the minor child aware of [Jamie's] financial difficulties" and telling J.G. that those financial difficulties would be resolved by moving to Macomb. Jonathan requested that the trial court enter an order granting him "primary parental responsibility for [J.G.] and primary residential placement."

¶ 18                              B. The Hearing on the Parties' Petitions

¶ 19        In January 2025, the trial court conducted a hearing on Jamie's petition to relocate. At the beginning of the hearing, the court asked, "We're set today for trial on relocation; is that correct?" Jonathan's attorney answered, "Correct. And we noticed up a petition to modify parenting time too so I think they could all be taken together." Jamie's attorney expressed concern

that he had not yet had the opportunity to file a written response to Jonathan's petition to modify but acknowledged that Jonathan's petition "was [seeking] basically a complete flop of primary parent." The court responded, "So, if relocation wasn't granted, basically, right?" Jonathan's attorney answered, "Exactly. That's a fair description and characterization of what we're doing. *** I felt it was necessary to get something on file as another option." The court answered, "Well, we'll address the relocation first, and then if there's any issues after that we'll have to hear those after the relocation." Jonathan's attorney replied, "That's fine, Judge. Very good."

¶ 20                                    1. *Judy W.*

¶ 21           Judy W. testified that she was Jamie's grandmother and J.G.'s great-grandmother. She lived in Brimfield and took care of J.G. before and after school, spent time with J.G. occasionally on weekends, and attended "some" of J.G.'s extracurricular activities. Judy stated that if J.G. moved to Macomb, it would not affect her relationship with J.G. because she would still visit and call her. She would "try" to attend J.G.'s extracurricular activities.

¶ 22           On cross-examination, Judy acknowledged that (1) she would no longer be watching J.G. before or after school if J.G. relocated to Macomb and (2) it would be more difficult for her to attend J.G.'s extracurricular activities due to the distance.

¶ 23                                    2. *Alex P.*

¶ 24           Alex P. testified that he currently resided in Macomb, Illinois, and had lived there for five years. He had been in a dating relationship with Jamie since April 2022, or nearly three years at the time of the hearing. He characterized their relationship as "[s]erious" and "[m]onogamous," noting that they had talked about getting married but wanted to live together first. He could see himself marrying Jamie and believed his relationships with Jamie and J.G. would be strengthened by their relocation to Macomb.

¶ 25 Alex stated he was employed as a traveling mechanic for BNSF railway and in that capacity was gone six to eight months of the year, but only Monday through Friday, and he was home on weekends. He had owned his three-bedroom home since 2020, which was located on six acres, with a wooded area and room for activities such as cookouts, fires, and playing with dogs. If J.G. was allowed to relocate there, she would have her own bedroom and bathroom.

¶ 26 Alex also testified that he had a "fun" relationship with J.G. and they often hung out, played catch, talked about video games, and played with the dogs. He also attended her extracurricular activities as often as he could.

¶ 27                              3. *Jonathan*

¶ 28 Jamie called Jonathan as an adverse witness, and Jonathan testified again during his own case-in-chief. Jonathan testified that he currently lived in Peoria, Illinois, and was unemployed, although he was actively seeking employment. He lived with his fiancée, Heidi C., and his 77-year-old father in a house his father owned that would be Jonathan's upon his father's passing. Jonathan had a driver's license and a vehicle.

¶ 29 Jonathan stated that he filed his motion to modify in the hopes of obtaining a majority of the parenting time. He acknowledged that he had previously lost some parenting time (Wednesday overnights during the school year) and explained that during J.G.'s 2021-22 school year, her elementary school had sent him messages several Tuesdays in a row about students contracting COVID-19, so he elected to keep J.G. out of school because he and his father were "high risk."

¶ 30 Jonathan testified that he was involved with J.G.'s education, explaining that he asks J.G. directly about school "every single day [that he sees] her." He last attended a parent-teacher conference the previous year. J.G. was an excellent student, and he had no concerns about

Jamie's care of J.G. concerning her education. He believed J.G. would succeed academically no matter what school she attended, but he also said he would like to see her "more challenged."

¶ 31       Jonathan named several of J.G.'s friends from school and agreed with Jamie's counsel that J.G. would be able to keep in communication with them if she moved because she had her own cell phone and he and Jamie could arrange "play dates" and "get-togethers."

¶ 32       Jonathan expressed concern that, if J.G. relocated, he would lose his weekly visits with her and see her only on alternating weekends. When asked why he objected to relocation, Jonthan stated, "I don't want to lose the majority of my time with [J.G.] throughout the year. There's some weeks where I only get to see her a few hours a week. I can't lose that." He continued, "I just want to spend time with my daughter."

¶ 33       On cross-examination by his own attorney, Jonathan testified that he lived at a Peoria address that was in the Dunlap school district. If his petition to modify were granted, J.G. would attend Dunlap schools. The trial court admitted copies of the school report cards comparing Dunlap schools with Macomb schools.

¶ 34       Jonathan's attorney showed him photographs of his dog, which he said J.G. "love[d]," a playground Jonathan built for her in his backyard, and J.G.'s bedroom at his home, which had four bedrooms. Jonathan also testified that he and Heidi were set to be married in May 2025. They had dated for seven years. His father added her name to the title of his home. She worked at the Pediatric Resource Center as a child abuse case coordinator. Jonathan stated that Heidi and J.G. "love[d] each other" and played video games and board games together.

¶ 35       Jonathan testified that the travel time from his home to Macomb was "a little over an hour and a half," meaning three hours of travel time for J.G. in order for him to exercise his Wednesday visitation rights, to which he did not want to subject her. He acknowledged that he

could travel to Macomb for those visits but stated that paying for a hotel would be expensive for him. If the trial court granted his petition to modify, he would be home with J.G. every day.

¶ 36 Upon further examination by Jamie's attorney, Jonathan acknowledged that he was not currently financially stable on his own and he relied on his father and Heidi to pay the monthly bills, utilities, taxes, and insurance. He also acknowledged that he had not conducted his own research into the comparison between Dunlap and Macomb schools but instead his attorney had done so. He also acknowledged that he had never personally heard Jamie talk to J.G. about her depression or anxiety relating to her financial obligations.

¶ 37                                    4. *Jamie*

¶ 38 Jamie testified that she currently resided in Brimfield and had been in a monogamous relationship with Alex for nearly three years. She wished to relocate with J.G. to live with Alex in Macomb, which was 74 miles from her current residence. Jamie was employed as a banker at the Bank of Farmington in a hybrid position, meaning she worked from home three days a week. She requested a fully remote position but had not received a response. She also investigated positions near Alex's home in Macomb but had not yet applied for any.

¶ 39 Jamie testified that "on paper," Brimfield and Dunlap schools were better than Macomb schools. However, she believed her daughter would continue to succeed in her education no matter which school she attended. Jamie had researched Macomb schools and had spoken with the principal at the school J.G. would attend about extracurricular activities. J.G. had been involved in basketball, softball, chorus, and tumbling, and she would be able to participate in similar activities in Macomb. J.G. would also be able to participate in a book club, which she could not do in Brimfield.

¶ 40 Jamie also testified that J.G.'s relationship with her great-grandmother would not

suffer if relocation was allowed because J.G. had her own phone and could text and call her at will.

¶ 41 Jamie denied that she had ever directly talked to J.G. about financial stressors. She explained that at times J.G. asked to do certain activities, such as go to the trampoline park, and Jamie had to explain that she did not have the money at the time to afford it. She also testified that J.G. is currently unable to participate in tumbling because of the expense. Jamie stated that she currently rents a home in Brimfield and her monthly expenses would decrease by about $967 a month if she could relocate to Macomb, which meant she would have more discretionary income to benefit J.G.

¶ 42 Jamie stated that she would do everything in her ability to ensure that Jonathan maintained a good relationship with J.G., including ensuring J.G.'s availability for phone calls and other electronic communication. She did not have any issue with Jonathan coming to Macomb for midweek visits or even meeting him midway. She also supported substantially increasing Jonathan's parenting time in the summer to "split it 50/50 a week on/week off."

¶ 43 On cross-examination, Jamie testified that she and Alex were not engaged and her name was not on the title of his house. They planned to live together first before committing to marriage. She also testified that she was aware that Macomb schools scored worse than Brimfield schools in language arts and math proficiency, but she was not concerned about her daughter attending Macomb schools. She acknowledged she had not investigated Dunlap schools. Jamie testified that if she were unable to work fully remotely and instead retained her hybrid position, she would need to find after-school care for J.G., which Jamie's grandmother now provides. She also testified that, if her relocation petition were denied, she would stay in Brimfield and keep J.G. at her current school. She, Alex, and J.G. would come up with a new plan "as a unit."

¶ 44 5. *Heidi C.*

¶ 45    Heidi C. testified that she lived with Jonathan and they were engaged to be married. She was a co-owner of the home they lived in with Jonathan's father, and she had lived there for the last seven years. She worked as a child protection specialist case coordinator at the Pediatric Resource Center since February 2024. Before that, she worked at the Center for Youth and Family Solutions. She described her relationship with Jonathan as "very stable." Heidi said she got along "very well" with J.G. and described J.G.'s relationship with Jonathan as "close." Heidi did not have any children of her own.

¶ 46    On cross-examination, Heidi testified that she and Jonathan's father pay all of the bills.

¶ 47                                    6. *Kamp*

¶ 48    Kamp, who was the GAL, was not sworn as a witness but stated that she stood on her written report. Jonathan's attorney pointed out that she had filed that report before receiving Jonathan's petition to modify. Kamp agreed that her report compared Brimfield schools to Macomb schools but did not compare Dunlap schools. Kamp was familiar with Dunlap schools because her child attended there; she believed they were some of the best schools in the nation.

¶ 49                          7. *The Trial Court's Ruling*

¶ 50    At the conclusion of the evidence, the trial court observed that "we have two good parents here and an exceptional young girl." Because the court believed the case was a "close call," it wanted to take its time to review the evidence and issue its ruling. The court stated, "I'm going to issue [my] ruling *** within 21 days, and I'll send that to the parties on the relocation. And then I guess depending on my decision, I may have a ruling on the petition to modify at that point too."

¶ 51    On January 24, 2025, the trial court issued its written ruling, granting Jamie's petition to relocate and denying Jonathan's petition to modify. The court first summarized the

testimony of each witness and found that "all the witnesses were credible and clearly love and care for the minor." Next, the court stated that it considered the statutory relocation factors listed in section 609.2(g) of the Act (750 ILCS 5/609.2(g) (West 2024)), as well as the GAL's report. The court stated as follows:

"The court grants the petition for relocation, finding by the preponderance of the evidence it is in the best interests of the child, noting the following factors:

Mother has a valid reason for relocation, to be with her long-term boyfriend and the financial benefits she testified to. The court recognizes the father's concerns about losing weekly time with the child, and that is also a valid objection to relocation. Overall, the court finds the improved financial situation would favor relocation.

In terms of school, the court finds this does not heavily weigh in either party's favor. While reports indicate Macomb is an inferior school to where she currently attends, no concrete concerns about Macomb schools were introduced.

Neither parent had concerns about [J.G.'s] being able to make new friends, and the mother was credible in stating she would work to maintain [J.G.'s] current friendships. This weighs in favor of relocation.

Overall, [J.G.] is in favor of the move per the GAL report, again favoring relocation. The court also notes the relocation, while providing some logistical problems for weekly visits, is not an overly long-distance move.

The court also finds a reasonable allocation of parenting time for father can be ordered as follows:

1. Father will continue his alternating weekends from Friday after

- 11 -

school until Sunday evening.

> 2. Father will receive one-half of school breaks (spring, Thanksgiving, and Winter).

> 3. The parties will have an alternating weekly schedule in the summer (50/50).

> 4. Father shall have *** two video visits each week.

> 5. Upon three days notice to mother, father may have a midweek after-school/evening visit with [J.G.] in Macomb. He is responsible for his own travel.

> Finally, the court will deny Respondent's recently filed Petition to Modify without prejudice."

¶ 52                    C. The Motion To Reconsider

¶ 53        In February 2025, Jonathan filed a motion to reconsider, alleging that the trial court had "fail[ed] to appropriately weigh" the evidence and restating much of the evidence and argument that he had presented at the hearing.

¶ 54        In April 2025, the trial court conducted a hearing on Jonathan's motion. Jonathan's attorney began his argument by stating, "We appreciate the Court's time in this matter. But we just disagree on how the Court weighed the statutory factors." After hearing the arguments of the parties, the court denied Jonathan's motion.

¶ 55        This appeal followed.

¶ 56                         II. ANALYSIS

¶ 57        Jonathan appeals, arguing that the trial court's decisions (1) to grant Jamie's petition for relocation and (2) to deny Jonathan's petition to modify were against the manifest

weight of the evidence. We disagree and affirm.

¶ 58                                    A. The Petition To Relocate

¶ 59                               1. *The Applicable Law and Standard of Review*

¶ 60          Section 609.2(g) of the Act provides that, when a trial court receives a petition for

permission to relocate, the court shall determine whether relocation is in the child's best interest

after considering the following factors:

> "(1) the circumstances and reasons for the intended relocation;
>
> (2) the reasons, if any, why a parent is objecting to the intended relocation;
>
> (3) the history and quality of each parent's relationship with the child and specifically whether a parent has substantially failed or refused to exercise the parental responsibilities allocated to him or her under the parenting plan or allocation judgment;
>
> (4) the educational opportunities for the child at the existing location and at the proposed new location;
>
> (5) the presence or absence of extended family at the existing location and at the proposed new location;
>
> (6) the anticipated impact of the relocation on the child;
>
> (7) whether the court will be able to fashion a reasonable allocation of parental responsibilities between all parents if the relocation occurs;
>
> (8) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to relocation;
>
> (9) possible arrangements for the exercise of parental responsibilities appropriate to the parents' resources and circumstances and the developmental

level of the child;

(10) minimization of the impairment to a parent-child relationship caused by a parent's relocation; and

(11) any other relevant factors bearing on the child's best interests." *Id.*

¶ 61    " 'In child custody cases, there is a strong and compelling presumption in favor of the result reached by the trial court because it is in a superior position to evaluate the evidence and determine the best interests of the child.' " *Young v. Herman*, 2018 IL App (4th) 170001, ¶ 64 (quoting *In re Marriage of Agers*, 2013 IL App (5th) 120375, ¶ 25). A trial court's best-interest determination will not be reversed unless it is against the manifest weight of the evidence. *In re Marriage of Fatkin*, 2019 IL 123602, ¶ 32.

¶ 62    "Under the manifest weight standard, an appellate court will affirm the trial court's ruling if there is any basis in the record to support the trial court's findings." *In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 24. " 'A decision is against the manifest weight of the evidence when an opposite conclusion is apparent or when the court's findings appear to be unreasonable, arbitrary, or not based on evidence.' " *Jameson v. Williams*, 2020 IL App (3d) 200048, ¶ 47 (quoting *In re Marriage of Verhines*, 2018 IL App (2d) 171034, ¶ 51). We will not "reweigh the evidence or assess witness credibility and set aside the circuit court's decision simply because a different conclusion may have been drawn from the evidence." *Id.* ¶ 51.

¶ 63                                  2. *This Case*

¶ 64    As an initial matter, Jonathan argues this court should apply a *de novo* standard of review instead of a manifest weight standard of review because he argued in his motion to reconsider that the trial court misapplied the law. See *Horlacher v. Cohen*, 2017 IL App (1st) 162712, ¶ 80 ("When reviewing a motion to reconsider that is based on a trial court's purported

misapplication of existing law, our standard of review is *de novo*.") However, Jonathan did not argue in his motion to reconsider that the trial court misapplied the law; instead, Jonathan argued that the court failed to properly weigh the evidence and asked the court to reach a different result. Indeed, Jonathan's attorney asserted that precise argument at the hearing: "We just disagree on how the Court weighed the statutory factors."

¶ 65    Accordingly, because Jonathan does not present a question of law on appeal, we review the trial court's decision for whether it was against the manifest weight of the evidence. See *Fatkin*, 2019 IL 123602, ¶ 32.

¶ 66    In this case the trial court has favored us with a written ruling summarizing the evidence, detailing the court's findings, and explaining its ruling. Although we agree with the trial court—and the GAL—that this is a "close case," we emphasize that our role is not to reweigh the evidence or reverse the decision of the trial court simply because we might have reached a different decision. Our role is to determine whether the decision the trial court reached—which we approach deferentially due to the trial court's superior position to " 'observe both parents' " and " 'assess and evaluate their temperaments, personalities, and capabilities' " (*In re Marriage of Eckert*, 119 Ill. 2d 316, 330 (1988) (quoting *Gallagher v. Gallagher*, 60 Ill. App. 3d 26, 31-32 (1978)))—was " 'unreasonable, arbitrary, or not based on the evidence,' " or whether " 'the opposite conclusion is apparent.' " *Jameson*, 2020 IL App (3d) 200048, ¶ 47 (quoting *Verhines*, 2018 IL App 2d 171034, ¶ 51).

¶ 67    The evidence in the present case supports the trial court's decision to grant Jamie's petition to relocate. Jamie wished to relocate to move in with Alex, which would substantially increase her monthly discretionary income, to J.G.'s benefit. Jonathan objected because he did not wish to lose time with J.G. However, the court took Jonathan's objection into account,

substantially increasing his summer visitation time and providing for additional midweek visits, though electronic, and the opportunity to visit in person whenever he wanted with three days' notice. As a result, the court was able to fashion a reasonable allocation of parental responsibilities between both parents and minimize any impairment to the father-child relationship.

¶ 68       The trial court observed that J.G. had "two good parents," both of whom had quality relationships with J.G. and neither of whom failed or refused to exercise parental responsibilities. The court also heard evidence that J.G. had little extended family in her existing location, only her great-grandmother and great-grandfather, although she had a good relationship with them. Her great-grandmother testified, however, that she did not believe J.G.'s relocation to Macomb would cause that relationship to suffer.

¶ 69       J.G. was in favor of the relocation and, although the trial court received evidence that Macomb school districts were inferior to Brimfield and Dunlap schools, both parents agreed that J.G. was an excellent student who would continue to excel scholastically. Additionally, Jamie testified that J.G. would have all of the same extracurricular activities available to her, as well as new ones.

¶ 70       The trial court also considered that the relocation distance was only minimally above the statutory relocation threshold of 50 miles and "not an overly long-distance move."

¶ 71       In his brief, Jonathan simply asks us to second guess the trial court's best-interest analysis and substitute his own. However, we reiterate that we will not "reweigh the evidence or assess witness credibility and set aside the circuit court's decision simply because a different conclusion may have been drawn from the evidence." *Id.* ¶ 51. Nothing in the record comes close to showing that the trial court's decision was unreasonable or arbitrary, and the opposite conclusion is not clearly apparent.

¶ 72    For the foregoing reasons, we conclude that the trial court's decision to grant Jamie's petition to relocate was not against the manifest weight of the evidence.

¶ 73                              B. The Petition To Modify

¶ 74    Jonathan also argues on appeal that the trial court erred by denying his petition to modify. He specifically argues that the court's decision "was not based upon the evidence" because, although the court entered a two-page written order addressing the section 609.2 relocation factors (see 750 ILCS 5/609.2 (West 2024)), it "failed to create a record of its basis for the denial of [Jonathan's petition to modify] 'without prejudice.' " Jonathan contends that the court "summarily denied" his petition without discussing the relevant decision-making and parenting time factors identified in sections 602.5 and 602.7 (*id.* §§ 602.5, 602.7) of the Act, which are applicable to petitions to modify. We disagree.

¶ 75    In support of his argument, Jonathan cites *In re Marriage of Adams*, 2017 IL App (3d) 170472, ¶¶ 19, 21, for the propositions that (1) " 'a parent's relocation constitutes a substantial change in circumstances' " and (2) " 'there is overlap among the best interest factors relevant to relocation and the best interest factors relevant to the allocation of parenting time.' " He is correct that *Adams* stands for those propositions, but he fails to explain how *Adams* supports his position that the trial court's decision was erroneous.

¶ 76    In *Adams*, in a 2015 joint parenting agreement, the mother was granted primary physical custody of the minors and the father was granted visitation. *Id.* ¶ 3. In 2016, the mother relocated the children 324 miles away without filing a petition to relocate, resulting in the father's filing a petition to modify parenting time, seeking a majority of the parenting time. *Id.* ¶ 4. At a hearing on the father's petition to modify, although the mother had not filed a petition to relocate (claiming that she did not believe she was required to because the 2015 joint parenting agreement

predated the 2016 effective date of the relocation statute), the trial court (1) considered the section 609.2 relocation factors and found that it would not have granted a relocation petition (*id.* ¶¶ 12, 14) and (2) granted the father's petition to modify, awarding him a majority of the parenting time and the mother visitation (*id.* ¶ 12).

¶ 77        On appeal, the mother argued that the trial court's order was an abuse of discretion because it was merely a punishment for her relocating without permission. *Id.* ¶ 17. The appellate court disagreed and affirmed the judgment of the trial court. *Id.* ¶¶ 22, 24. In doing so, the appellate court noted that "[courts] considering the modification of parenting time[ ] *** consider the best interest factors delineated in section 602.7 of the Act," but in this case, the trial court had considered the section 609.2 factors. *Id.* ¶ 20. The court observed as follows:

"The mother describes the section 609.2 factors as additional factors. However, it is clear from reading of the statutes that there is overlap among the best interest factors relevant to relocation and the best interest factors relevant to the allocation of parenting time. Also, the mother's relocation was itself the relevant fact in the trial court's determination of the best interests of the children in the allocation of parenting time. It was the relocation that precipitated the substantial change in circumstances. Although the trial court must consider all relevant facts, it is not required to make an explicit finding or reference to each factor. *In re Custody of G.L.*, 2017 IL App (1st) 163171.

The trial court specifically discussed the relocation factors and concluded that a relocation petition would not have been granted, which also specifically addressed many of the best interest factors. *** We find that the trial court's decision, that the relocation was not in the children's best interests and that the

- 18 -

father met his burden of showing that the relocation amounted to a change in circumstances that necessitated a modification of parenting time to serve the best interests of the children, was not against the manifest weight of the evidence." *Id.* ¶¶ 21-22.

¶ 78 We fail to see how *Adams* supports Jonathan's argument that the trial court erred in this case. *Adams* stands for the proposition that when a parent's relocation constitutes the change in circumstances prompting a modification of parenting time, a trial court that properly considers the statutory relocation factors *need not* specifically enumerate its consideration of the best-interest factors relevant to the allocation of parenting time.

¶ 79 In the present case, Jonathan's petition for a modification of parenting time alleged only two substantial changes in circumstances warranting modification of parenting time: (1) Jamie's filing of her petition to relocate and (2) Jamie's telling J.G. that her financial difficulties "would be resolved by moving to Macomb." Clearly, Jonathan's petition to modify was premised entirely on Jamie's proposed relocation. The trial court conducted a hearing, at which (1) Jonathan's attorney suggested that the two competing petitions "be taken together" and (2) Jonathan had the full and fair opportunity to present evidence and be heard, including on the allegations he raised in his petition to modify. The court entered a lengthy written order detailing its factual findings and conclusions. The court was not required to address each statutory relocation and parenting time factor in its written order.

¶ 80 For the foregoing reasons, we disagree with Jonathan's assertion that "the trial court's ruling failed to properly consider the evidence in the case of [Jonathan's petition to modify] and the delineated statutory factors," and we affirm the judgment of the trial court.

¶ 81 In closing, we thank the trial court for its thoughtful and comprehensive written

ruling, which we found very helpful in resolving this case.

¶ 82                                III. CONCLUSION

¶ 83         For the reasons stated, we affirm the trial court's judgment.

¶ 84         Affirmed.